**Raymond J. TIMM, Plaintiff–Appellant,**

v.

**The MEAD CORPORATION, Defendant–Appellee.**

**No. 93–3629.**

United States Court of Appeals, Seventh Circuit.

Argued June 2, 1994.

Rehearing and Suggestion for Rehearing En Banc Denied Sept. 29, 1994.

Decided Aug. 9, 1994.

Richard L. Lucas, Lucas & Associates, Addison, IL, Walter P. Maksym (argued), Maksym & Associates, Oak Brook, IL, for plaintiff-appellant.

Bennett L. Epstein, Peter R. Bulmer (argued), Hopkins & Sutter, Chicago, IL, for defendant-appellee.

Before FAIRCHILD, FLAUM and KANNE, Circuit Judges.

FLAUM, Circuit Judge.

Raymond Timm sued The Mead Corporation, parent company of his ex-employer, Zellerbach, alleging that he was demoted and eventually discharged on the basis of his age (he was in his mid-forties) in violation of the Age Discrimination in Employment Act, 29 U.S.C. §§ 621 *et seq.* The district court granted Mead's motion for summary judgment on both the federal ADEA claim and the pendent state law claims that Timm had included in the complaint. On appeal Timm maintains that the district court was wrong on the merits to dismiss the federal claim and wrong jurisdictionally to retain and decide the state claims after the only federal element in the case dropped out. We affirm.

In 1989 Timm was the Vice President of Administration and Operations of the Midwest Area of Zellerbach's Central Region. Since the beginning of 1988, the President of the Area, and Timm's direct superior, had been Merle Impson. Impson concurrently served as the Regional President as well and was given the Midwest appointment (at least in his own opinion) in order to improve performance in the Area, which he and Zellerbach's President considered to be subpar. Impson was concerned with the slow pace of the centralization of the purchasing, credit management and accounting functions in the Area (responsibility for which rested with Timm) and also was not pleased with the prevailing "management style." As Impson's tenure in the Midwest continued, he and Timm did not see eye to eye on matters of management. Timm thought that Impson's approach was "wrong," that Impson surrounded himself with "yes" men and injected a "negative, critical attitude" into the organization. Timm thought that his way was better and more consistent with the corporate tradition at Mead. Nevertheless, he was told to conform his management practices to Impson's liking.

In January, 1989, Impson completed an annual written performance appraisal for Timm, covering Timm's work in the previous year. Impson gave Timm an overall rating of "Competent" which, on the provided scale, fell between "Outstanding" and "Excellent" on one side and "Unsatisfactory" and "Mar-

ginal" on the other. Written comments were both praising and critical, and some clearly conveyed the message that improvement or progress was expected in certain areas. For example, while Timm had "managed the [centralization of financial and asset controls] reasonably well, more effort is required to nail down the necessary controls to protect company assets." In another area, though Timm "has taken the necessary action steps to improve, ... full compliance remains unclear" and "additional attention as shown by internal audit" is needed. Timm also "functionally ... does a good job" supervising managers but "needs to continue to improve people management skills." Expectations for 1989 also included paying "great attention" to providing adequate support to the branch divisions in the Area as the centralization process continued, focusing on the "development of Area H.Q. employees," and demonstrating "initiat[ive] and ... responsive[ness] to [branch] G.M. needs." Impson and Timm discussed the written evaluation, and on that occasion, Timm has acknowledged, their conflicting views of proper management technique (and Impson's criticism of Timm's) came to the surface.

In May, a draft of an internal audit of the Midwest Area commented critically on numerous functions within Timm's areas of responsibility. The final audit, issued in July, was, in Impson's opinion, "the longest and the most critical [report that he] had seen as manager ... in all my years with the company." Timm disagreed, finding the criticisms in the May version "nitpicky." Also in May, a Zellerbach Vice President (and friend of Timm's) told Timm that Impson was dissatisfied with him and his counterparts in the other Areas within the Region. Timm acknowledged that Impson's displeasure with him could be a result of the difference in their management styles. Timm, however, believed that his approach better comported with "the Mead philosophy" and thus felt compelled to adhere to it rather than adopt Impson's.

Overall, Timm felt increasing pressure from Impson through the first half of 1989 and believed that their relationship was deteriorating. On June 6, Timm sought a trans-

fer within Mead to a position outside of Impson's control, identifying "our ... management-style conflict" to Impson as the reason. Impson readily agreed, noting that due to Timm's performance he had already begun to consider replacing Timm; Impson explained that Timm "came to me a week before I went to him." During the first week of July, Impson told Timm that he had until September 1 to secure another position within Mead. In August, while Impson was away from the office recuperating from a heart attack, Timm rescinded his transfer request and chose to remain in his current position hoping that he and Impson could "work this out" when Impson returned. Timm informed Impson of his decision by phone; Impson told Timm that he would have to think about Timm's new request. When Impson returned to work two weeks later, he told Timm that he would not be retained as a Vice President but did offer him a demotion. Soon after, in early September, Impson laid out several alternatives in more detail: Timm could accept a demotion to Midwest Area Accounting Manager (later titled Area Controller), secure another position within the company by the end of November, or leave Zellerbach under either one of two severance arrangements. Two weeks later Timm accepted the demotion. Timm was eventually terminated in 1991 when the Midwest Area was dissolved.

On appeal, Timm has focused exclusively on the propriety of the demotion; following his lead, we will not assess the merits of that part of his original claim challenging his subsequent discharge from Mead. In order to establish an evidentiary basis for his claim, Timm for the most part has relied upon the *McDonnell–Douglas* method of presenting proof of discriminatory treatment rather than arguing directly that the evidence demonstrates that discriminatory motives were behind his demotion. *See Troupe v. The May Department Stores Co.,* 20 F.3d 734, 736 (7th Cir.1994); *Anderson v. Baxter Healthcare Corp.,* 13 F.3d 1120, 1122 (7th Cir.1994). Although it is a matter of dispute between the parties, we will proceed by assuming, *arguendo,* that Timm can establish a "prima facie" case of age discrimination and confine our inquiry to (1) whether Mead has

succeeded to rebut the inference of discrimination that would so arise by articulating a legitimate, nondiscriminatory reason for demoting Timm and (2) whether Timm has proffered sufficient evidence that would allow a jury to disbelieve Mead's explanation and find that Timm has carried his ultimate burden of persuasion. *See id.* at 1122–24.

■ That Mead has satisfied its burden of production we have no doubt. Impson explained that he reached the conclusion that Timm must go because Timm did not satisfy Impson's expectations as laid out in the January 1989 performance evaluation. This reason was amply grounded in various admissible evidence like Impson's testimony itself, the admitted unresolved conflict between Timm and Impson with regard to good management practice, and the unfavorable preliminary and final audits. (Even if, as Timm claims, the final report was issued after Impson finally made up his mind to demote him, it certainly documents the deficiencies in Timm's performance Impson claims to have perceived). Timm maintains that because the January report adjudged his overall performance as "Competent," failure to meet Impson's expectations that he improve from that baseline cannot constitute a legitimate reason for demoting him. What Timm misunderstands is that for a reason to be "legitimate," in the sense of sufficient to rebut a prima facie case, it need not be a good or sympathetic justification for what the employer did; it need only be nondiscriminatory and, if true, (even if shortsighted or ultimately a product of poor business judgment) merely explain why the challenged action was taken. *See McCoy v. WGN Continental Broadcasting Co.,* 957 F.2d 368, 373–74 (7th Cir.1992). If an employer genuinely expects a competent employee to be better than competent and fires him for not excelling, the employer's conduct is, for purposes of the federal employment discrimination law, adequately explained. It is always the employer's honestly held beliefs that control. In any event, the overall check-mark rating of competent given to Timm in the January evaluation can do little to establish that Mead's proffered reason for his demotion was in fact a nonreason. The same docu-

ment memorialized that improvements were needed and expected. That Impson felt that Timm failed to deliver certainly satisfies Mead's burden of production.

For the same reason, Timm's assertion that this proffered reason of inadequate performance/progress should not be believed is not supported by sufficient evidence to create a genuine issue of fact for trial. He cannot refute Mead's position that he was demoted for performance-related reasons by merely asserting that a company cannot demand improvements from an arguably adequate but unspectacular employee. It can, and in this case Mead did. Timm did not create a factual issue as to the credibility of Mead's explanation by providing a "detailed refutation of events which underlie the employer's negative performance assessment," *Dey v. Colt Construction & Development Co.*, 28 F.3d 1446, 1460 (7th Cir.1994); if anything, he confirmed many of them. Timm has not otherwise shown that Mead's explanation is unworthy of belief. While he asserts that Mead has vacillated by offering multiple, inconsistent reasons at various stages in this litigation, Mead has in fact always claimed that Timm's failure to satisfy Impson's performance expectations motivated the decision to demote. That at one point Impson referenced Timm's performance generally, at another he explained that it did not improve as expected, and before us Mead phrases the problem as a failure "to meet Mr. Impson's expectations, as evidenced in part by the May 1989 audit and the slow pace of centralization" simply does not demonstrate that Mead has been offering up an eyebrow-raising series of contradictory explanations. Furthermore, Timm has not presented separate evidence of discriminatory animus sufficient to create a triable issue of fact in this case. Indeed, the only bit of proof even mentioning age is that in November 1988 Impson requested a list of Midwest Area employees who were sixty years of age and older. Timm contests the validity of Mead's

explanation that this was done as part of preliminary contemplation of an early retirement plan by asserting (with Mead disputing) that, by virtue of his position, he would have known if such a plan were under discussion. Even so, this single episode, unrelated on this record to any of Timm's travails with Zellerbach, and not reinforced by any other alleged incidents of Impson's age-consciousness, could not carry Timm's burden of proof on the issue of his demotion. Circumstantial evidence is one thing; conjecture is another. Summary judgment was appropriately granted for Mead on Timm's ADEA claim.

■ After disposing of the federal issue in this case, the district court, in the same opinion and order, considered (and rejected) Timm's state law claims because they had been fully briefed and argued and the court found that the record was complete and accurate with respect to them. Timm maintains that the district court erred by exercising its supplemental jurisdiction once no federal claim remained in the case. Of course, there is no doubt that as an initial matter under 28 U.S.C. § 1367(a) the district court had jurisdiction to decide the state claims because no one contends that they do not form part of the same Article III case or controversy as the ADEA claim over which the district court did have original jurisdiction. *Accord Myers v. County of Lake*, 30 F.3d 847, 849–850 (7th Cir.1994). The only question raised here is whether raised here is whether the district court should have declined to exercise that jurisdiction under § 1367(c), which states that "[t]he district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if ...," among other things, "the district court has dismissed all claims over which it has original jurisdiction."

Section 1367 was "intended to codify rather than to alter the judge-made principles of pendent and pendent party jurisdiction," *Brazinski v. Amoco Petroleum Additives Co.*, 6 F.3d 1176, 1182 (7th Cir.1993),[1] and the

---

1. This is true at least to the extent these principles are consonant with the apparently exclusive (but generally stated) list of bases for declining the exercise of supplemental jurisdiction contained in § 1367(c). *See Executive Software North America, Inc. v. United States District*

*Court*, 24 F.3d 1545, 1559 & n. 12 (9th Cir.1994). Section 1367(c)(3), at issue in this case, clearly echoes the discretionary approach to proceeding with adjudication of (non-diverse) state claims after dismissal of claims within a district court's original jurisdiction that has developed in the

judge-made principle that deals with the possible dismissal of suits whose federal character has dissipated calls for a discretionary approach in which considerations of judicial economy, convenience, fairness, and comity are weighed. *See Carnegie–Mellon University v. Cohill,* 484 U.S. 343, 350 n. 7, 108 S.Ct. 614, 619 n. 7, 98 L.Ed.2d 720 (1988). In *Brazinski,* we retreated somewhat from strong dicta in *Wentzka v. Gellman,* 991 F.2d 423 (7th Cir.1993), suggesting that the proper exercise of that discretion will, except under narrow and particular circumstances, require declining jurisdiction over pendent state claims whenever the claim conferring federal jurisdiction is dismissed before trial. *See id.* at 425–26. Instead, we recognized that especially when difficult and unsettled state law issues are not implicated by the pendent claims, it is entirely acceptable under the discretionary principle for a federal court to decide those claims even after dismissing the main claim. *See Brazinski,* 6 F.3d at 1182; *see also Growth Horizons, Inc. v. Delaware County,* 983 F.2d 1277, 1285 n. 14 (3d Cir.1993). So long as an arguable balance of the above mentioned factors points in the direction of the district court's discretionary determination whether or not to exercise jurisdiction, that decision, being discretionary, will not be disturbed. That the jurisdictional hook is eliminated before trial at best only preliminarily informs the balance; the nature of the state law claims at issue, their ease of resolution, and the actual, and avoidable, expenditure of judicial resources can and should make the difference in a particular case.[2] *See id.; see also Imagineering, Inc. v. Kiewit Pacific Co.,* 976 F.2d 1303, 1309 (9th Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1644, 123 L.Ed.2d 266 (1993). Here, by the time the ADEA claim was dismissed, the state law claims were ripe for decision, the applicable state law was straightforward, the litigation was well over a year old, and discovery, which had been at times contentious, was completed. The district court reasonably

concluded that there was no need to delay the resolution of this matter (and add to the burdens of the Illinois court system) by having the parties litigate the unspectacular state law issues anew in state court. And since Timm does not appeal the district court's handling of the merits of the state claims, the judgment must be affirmed.

---

2. case-law since *Mine Workers v. Gibbs,* 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966).

2. Exactly *when* before trial the federal claim is eliminated, however, is relevant. For example, dismissal at the pleading stage usually counsels

strongly in favor of relinquishing jurisdiction because at that point in a case "judicial resources" typically are yet to be heavily tapped. *See Wright v. Associated Insurance Companies Inc.,* 29 F.3d 1244, 1251 (7th Cir.1994).