Arnold D. PILKINGTON,
et al., Plaintiffs,

v.

**UNITED AIRLINES, INC.,**
**et al., Defendants.**

No. 92–1032–CIV–T–17B.

United States District Court,
M.D. Florida,
Tampa Division.

March 27, 1996.

James J. Cusack, Battaglia, Ross, Dicus & Wein, P.A., Tampa, FL and Stephen Joshua Wein, Battaglia, Ross, Dicus & Wein, St. Petersburg, FL, for plaintiffs.

Peter W. Zinober, Zinober & McCrea, P.A., Tampa, FL, Tom A. Jerman, O'Melveny & Myers, Los Angeles, CA, Robert T. Kofman, Stearns, Weaver, Miller, Weissler, Alhadeff & Sitterson, P.A., Miami, FL, Alice Ruth Huneycutt, Stearns, Weaver, Miller, Weissler, Alhadeff & Sitterson, P.A., Tampa, FL, Babette A. Ceccotti, Cohen, Weiss & Simon, New York City, Felice Busto, Marcus C. Migliore, R. Russell Bailey, Air Line Pilots Assn., Washington, DC, Kevin Christopher Ambler, Prevatt, England, Ambler, Snyder, Steingold & Taylor, Tampa, FL, for defendants.

## ORDER ON DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

KOVACHEVICH, Chief Judge.

This cause is before the Court on the following motions and responses:

1. Defendant United Airlines, Inc.'s First Motion for Summary Judgment (Railway Labor Act Preemption) and Supporting Memorandum, filed July 14, 1995 (Docket No. 148).

2. Defendant United Airlines, Inc.'s Second Motion for Summary Judgment (Statute of Limitations) and Supporting Memorandum, filed July 14, 1995 (Docket No. 149).

3. Defendant United Airlines, Inc.'s Third Motion for Summary Judgment (Lack of Evidence) and Supporting Memorandum, filed July 14, 1995 (Docket No. 150).

4. Defendants Air Line Pilots Association and its Master Executive Council for United Airlines' (collectively, "ALPA") Motion for Summary Judgment (Docket No. 157) and Memorandum in Support (Docket No. 158), filed July 14, 1995.

5. Plaintiffs' Memorandum in Opposition to Defendants' Motions for Summary Judgment Based on Railway Labor Act Preemption (Docket No. 192), filed October 27, 1995.

6. Plaintiffs' Memorandum in Opposition to Defendants' Motions for Summary Judgment Based on Statute of Limitations (Docket No. 193), filed October 27, 1995.

7. Plaintiffs' Memorandum in Opposition to Defendants' Motions for Summary Judgment Based on a Lack of Evidence (Docket No. 194), filed October 27, 1995.

### STANDARD OF REVIEW

The Court will grant a motion for summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).

Under *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265

(1986), both the movant and the non-movant bear certain burdens. Initially, the movant must "[inform] the district court of the basis for its motion, and [identify] those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Id.* at 324, 106 S.Ct. at 2553. The movant satisfies that initial burden "by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325, 106 S.Ct. at 2554. However, the nature of the movant's initial burden "varies depending on whether the legal issues, as to which the facts in question pertain, are ones on which the movant or the non-movant bears the burden at trial." *Fitzpatrick v. City of Atlanta,* 2 F.3d 1112, 1115 (11th Cir.1993).

■ In addition to the movant's initial summary judgment burden, it must also show that "no reasonable jury could find" for the non-movant "on all the essential elements of its case on which [the movant] bears the burden of proof at trial." *United States v. Four Parcels of Real Property in Greene & Tuscaloosa Counties,* 941 F.2d 1428, 1438 (11th Cir.1991) (citations omitted). Unless the non-movant "comes forward with significant, probative evidence demonstrating the existence of a triable issue of fact," the movant is entitled to summary judgment upon satisfying its burdens. *Id.* Of course, if the movant fails to satisfy its burden, the non-movant need not make this showing and the Court will deny the motion for summary judgment. *See Clark v. Coats & Clark, Inc.,* 929 F.2d 604 (11th Cir.1991).

■ Once the movant satisfies its initial burden by showing the absence of a genuine issue of material fact, the non-movant must make a "sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Celotex,* 477 U.S. at 323, 106 S.Ct. at 2552. Specifically, the non-movant must go beyond the pleadings and designate "specific facts showing that there is a genuine issue for trial." *Id.* at 324, 106 S.Ct. at 2553.

■ Issues of fact are "genuine only if a reasonable jury, considering the evidence presented could find for the non-moving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). Facts are "material" if they will affect the outcome of the trial under governing law. *Id.* at 248, 106 S.Ct. at 2510. In determining whether a genuine question of material fact exists, the Court must consider all evidence in the light most favorable to the non-movant. *Sweat v. Miller Brewing Co.,* 708 F.2d 655 (11th Cir.1983).

■ In determining whether the non-movant has met its burden, the question becomes whether the non-movant's evidence could support a reasonable jury finding that the non-movant established its burden by the appropriate evidentiary standard of proof that would apply at trial. *Anderson,* 477 U.S. at 254–55, 106 S.Ct. at 2513–14. However, in determining whether to grant summary judgment, the district must remember that "credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Anderson,* 477 U.S. at 255, 106 S.Ct. at 2513.

### FACTUAL BACKGROUND

Prior to 1985, the pilots of United Airlines, Inc. ("United"), operated under a collective bargaining agreement ("CBA") negotiated between United and ALPA. In January 1984, both parties served notice under the terms of the CBA to open negotiations about new contractual terms. United proposed a lower pay scale for new hires and ALPA objected to United's proposal.

United management began anticipating a possible strike by its unionized pilots (represented by ALPA) early in 1985. In order to assure that it would have enough flight crews in the event of a strike, United began recruiting fleet qualified pilots to be hired as permanent replacements in the event its pilots went on strike.

On or about April 15, 1985, the National Mediation Board notified ALPA and United that the collective bargaining negotiations had reached an impasse and after a cooling

off period, both ALPA and United were entitled to engage in lawful self-help under the Railway Labor Act. A strike was called by ALPA on May 17, 1985, and it lasted twenty-nine (29) days.

Plaintiffs are fleet qualified pilots (and one incumbent United pilot who crossed the picket line) hired by United as permanent replacements. Shortly before and during the strike, United offered these Plaintiffs employment as flight officers. These offers were contained in letter agreements (hereinafter "Individual Agreements") setting forth certain terms of their new employment such as starting salaries and descriptions of employee benefits. The agreement also contained assurances from United that, because of the commitment made to United during the labor dispute to help continue operations, the replacement pilots would have the full support of management in any difficulties they encountered during their employment.

At the end of the strike, United and ALPA negotiated and signed a Back-to-Work Agreement on June 12, 1985, which, in part, prohibited either side from engaging in any reprisals or harassment. The strike was settled by June 15, 1985, at which time ALPA and United proceeded with business under a new collective bargaining agreement which governed the employment of *all* pilots employed by United, including Plaintiffs. Plaintiffs allege that harassment of the replacement pilots began immediately upon the return of the striking pilots and was sanctioned and encouraged by ALPA.

In 1986, Plaintiffs Pilkington and Custer organized, and later incorporated, the Fleet Qualified Pilots Association ("FQPA") in order to combat the ongoing and continuing harassment. Plaintiff Pilkington was the clearinghouse for the organization and served as the focal point for communications among and between fleet qualified pilots, United management and other entities concerning the alleged harassment. Through the auspices of FQPA, Plaintiffs consulted counsel and announced a blueprint of action to seek a remedy for the alleged harassment no later than 1987.

In a further effort to resolve some issues of conflict remaining from the strike, United and ALPA entered into a Letter of Agreement on April 3, 1987. In the 1987 Letter of Agreement, ALPA agreed to take extensive active measures to eliminate the residual tension between those pilots who struck and those who worked during the strike, including activities which might constitute reprisals or recriminations as a result of the 1985 strike (e.g., any worker lists, workplace ostracism or harassment). United similarly agreed to take extensive active measures to restore a positive working relationship with all pilots.

While recognizing that United attempted to combat the harassment after the strike, Plaintiffs allege that United abandoned such efforts by 1987, corresponding with a management change at United. On June 9, 1987, Richard Ferris resigned as CEO of United and was replaced by Frank Olson. Upon his appointment, Mr. Olson stated that he was going to actively attempt to appease the pilot's union. United then began to dismantle some of the strikebreaker protections it had established under Ferris.

Plaintiffs allege that incidents of harassment have permeated the workplace since 1985 and are intended to interfere with Plaintiffs' abilities to perform their jobs safely. Plaintiffs cite the following as exemplary of their treatment: refusal of ALPA pilots to communicate or cooperate with non-striking pilots; severe harassment from ALPA pilots who included their names on a "scab list" which is continually updated and re-distributed to ALPA pilots; physical threats and assaults; ostracism on layovers; vandalism of flight manuals and approach charts; hate mail; thefts from company mail boxes; and verbal insults and ridicule in front of flight crew members and passengers.

Based upon these facts, Plaintiffs in their First Amended Complaint assert five (5) causes of action: one count against both defendants alleging violation of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961 *et seq.* ("RICO") (Count I); two counts against ALPA only, one for tortious interference with contract (Count II) and one for tortious interference with business relationships (Count III); and two

counts against United only, one for breach of contract (Count IV) and one for fraudulent misrepresentation (Count V).

## COUNT I—RICO

█ Both parties agree that it is well settled that a civil RICO claim must be brought within four (4) years of the time that the cause of action accrues. *Agency Holding Corp. v. Malley–Duff & Assoc., Inc.*, 483 U.S. 143, 156, 107 S.Ct. 2759, 2767, 97 L.Ed.2d 121 (1987). "[A] civil RICO cause of action begins to accrue as soon as the Plaintiff discovers, or reasonably should have discovered, both the existence and source of his injury and that the injury is part of a pattern of racketeering activity. *Bivens Gardens Office Building, Inc. v. Barnett Bank*, 906 F.2d 1546, 1554–55 (11th Cir.1990), *cert. denied*, 500 U.S. 910, 111 S.Ct. 1695, 114 L.Ed.2d 89 (1991).

The *Bivens* court expressly rejected the "last predicate act" theory, which would permit RICO recovery as long as the last predicate act of racketeering occurs within four (4) years of the filing of the suit. Specifically, the court held that a 1983 RICO claim concerning the fraudulent 1975 takeover of a hotel was time-barred, even though the pattern of racketeering was alleged to have continued until 1981. *Id.* at 1554–56.

Plaintiffs in this case assert a single, continuous course of injury, specifically, ongoing emotional and physical distress designed to force them from their employment. This injury allegedly resulted from a widespread and continuous pattern of harassment that was initiated as soon as the striking pilots returned to work in 1985.

The essential fact that must be established is when Plaintiffs knew or should have known that they were injured as a result of the alleged pattern of post-strike harassment. In this regard, Defendants have met their initial burden as required by *Celotex* of "[informing] the district court of the basis for its motion, and [identified] those portions of the 'pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits' ... [to] demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 324, 106 S.Ct. at 2553.

█ Plaintiffs were clearly aware of the alleged pattern of ongoing and continuous harassment no later than 1986. In addition, during the 1985–86 time period Plaintiffs knew, through numerous discussions with each other and other non-strikers, that a pattern of widespread harassment was occurring as to nonstrikers. Furthermore, Plaintiffs themselves noted that the harassment caused mental distress on an ongoing and continuing basis since 1985, thus demonstrating that were aware that they had been injured by the pattern of harassment more than four (4) years before this lawsuit was filed.

In addition to Plaintiffs' own acknowledgements, the communications and actions of FQPA further substantiate that Plaintiffs knew of their alleged injuries by 1987 at the latest. A series of documents prepared by Plaintiff Pilkington and the other leaders of the FQPA between June and December 1987 and sent to all fleet qualified pilots confirm that by 1987 Plaintiffs: (1) believed that their mental distress and intolerable work situation were caused by the alleged pattern of harassment by striking pilots that had begun two (2) years before; (2) held ALPA and United responsible; and (3) had consulted counsel with respect to the alleged injuries. Furthermore, in April 1988, Plaintiff Pilkington brought the fleet qualified pilots' complaints about the effects of harassment to the attention of the Federal Aviation Administration and the media. Thus, by the spring of 1988, more than four (4) years before this suit was filed, Plaintiffs had repeatedly and publicly complained about the pattern of harassment and its corresponding injurious effect.

In an attempt to circumvent the *Bivens* rule, Plaintiffs assert that their RICO cause of action did not accrue until 1990, when Plaintiff Leonard Gieschen was disqualified from flying by an airline psychologist, allegedly due to the stress of the continuous harassment from ALPA members. Plaintiffs argue that "[a] RICO plaintiff has standing if, and can only recover to the extent that, he has been injured in his business or property by the conduct constituting the violation" and

that "if a RICO plaintiff does not yet have a cognizable injury, or standing, his action cannot be said to have accrued."

Plaintiffs clearly argue against themselves by taking this position. If the Court were to apply the foregoing argument based upon the facts of this case, then any plaintiff still employed would not be yet injured. Quite simply, Plaintiffs' argument demonstrates their desperation to preserve a clearly stale claim. Consequently, the Court finds, based upon the Statute of Limitations as applied in *Bivens,* that a grant of summary judgment in favor of both Defendants as to Count I is entirely appropriate.

Because the Statute of Limitations bars the RICO cause of action in this case, and, is thus dispositive of Plaintiffs' claim, the Court will not accept Plaintiffs' invitation to explore the contours of what the Court perceives to be in essence a breach of the duty of fair representation claim creatively couched in terms of a RICO cause of action. As Defendants point out, there would be serious questions of the propriety of such a claim, not the least of which is RLA preemption. As succinctly pointed out by the D.C. Circuit Court of Appeals:

> Congress is certainly free to lay an extensive RICO blanket over entire areas of federal regulation, making attorneys fees and treble damages available in areas such as federal labor law. However, we are confident that if Congress had intended to so drastically alter our legal terrain, it would have done so clearly and unequivocally.

*Yellow Bus Lines v. Local Union 639,* 913 F.2d 948 (D.C.Cir.1990).

### *STATE LAW CLAIMS*

■ This Court had original jurisdiction over this case by virtue of the federal question presented by Plaintiffs' RICO claim. Supplemental jurisdiction over the state law claims was conferred by virtue of 28 U.S.C. § 1367(a) "over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." "The district courts may decline to exercise sup-

plemental jurisdiction over a claim under subsection (a) if— ... (3) the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c). "Factors to be considered by the court include (1) the length of time the matter has been pending before the federal court; (2) the proximity of the trial date; and (3) the predominance of issues of federal, as opposed to local concern." *Reynolds v. Mercy Hospital,* 861 F.Supp. 214 (W.D.N.Y.1994) (quoting *Drexel Burnham Lambert v. Saxony Heights Realty,* 777 F.Supp. 228 (S.D.N.Y.1991).

The Seventh Circuit Court of Appeals has held that it was not improper for a district court to retain jurisdiction and decide state claims, after the only federal element in the case was eliminated from consideration, after summary judgment had been granted in favor of an employer in an age discrimination case. *Timm v. Mead Corp.,* 32 F.3d 273 (7th Cir.1994). The court in *Timm* found that "by the time the ADEA claim was dismissed, the state law claims were ripe for decision, the applicable state law was straight forward, the litigation was well over a year old, and discovery, which had at times been contentious, was completed." *Id.* at 277. As a result, the Seventh Circuit Court of Appeals found that the district court reasonably concluded that there was no need to delay the resolution of the matter and add to the burdens of the state court judiciary by re-litigating the "unspectacular" state law issues in state court. *Id.* at 277.

At this point, with summary judgment granted in favor of Defendants as to Plaintiffs' federal question, it is within this Court's discretion to decide whether to dismiss the balance of Plaintiffs' claim for lack of jurisdiction. This case, however, has been pending in this Court for well over three (3) years, discovery has concluded, and most importantly, the issue this Court finds dispositive of the remaining state law claims concerns the reach of federal pre-emption in the labor law setting. This aspect of the case clearly implicates important federal concerns best resolved in federal court.

■ Furthermore, virtually twelve (12) years have passed since the strike that gave

rise to this dispute, an extensive amount of discovery has taken place, and the amount of time and effort expended by the Court and the litigants in developing this case to this point has been substantial. Thus, considerations of "judicial economy, convenience and fairness to litigants," *United Mine Workers v. Gibbs*, 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966), point clearly in favor of retaining jurisdiction over these claims and deciding them on the merits in this Court.

## I. RLA Pre-emption Standard

■ In *Hawaiian Airlines, Inc. v. Norris*, —— U.S. ——, 114 S.Ct. 2239, 129 L.Ed.2d 203 (1994) the United States Supreme Court accords RLA pre-emption with the pre-emption standard for Section 301(a) of the Labor Management Relations Act, 1947 as set forth in *Lingle v. Norge Div. of Magic Chef*, 486 U.S. 399, 108 S.Ct. 1877, 100 L.Ed.2d 410 (1988). It thus recognizes that where "the resolution of a state-law claim depends upon the meaning of a collective bargaining agreement, the application of state law (which might lead to inconsistent results since there could be as many state law principles as there are States) is preempted and federal labor law principles—necessarily uniform throughout the nation—must be employed to resolve the dispute." *Lingle*, 486 U.S. at 407, 108 S.Ct. at 1882.

> The pre-emptive force of § 301 is so powerful as to displace entirely any state cause of action 'for violation of contracts between an employer and a labor organization.' Any such suit is purely a creature of federal law, notwithstanding the fact that state law would provide a cause of action in the absence of § 301.

*Franchise Tax Board of Cal. v. Construction Laborers Vacation Trust for Southern Cal.*, 463 U.S. 1, 23, 103 S.Ct. 2841, 2853, 77 L.Ed.2d 420 (1983).

■ *Hawaiian Airlines* involved claims for discharge in violation of the Hawaii Whistleblower Protection Act and the Supreme Court found that the issue to be resolved in that case—whether the employer's actions make out the element of discharge under Hawaii law—was a purely factual question that required no interpretation of the collective bargaining agreement. *Hawaiian Airlines*, at ——, 114 S.Ct. at 2251. Thus, where interpretation of the collective bargaining agreement is required to adequately address and resolve a dispute, federal law must pre-empt state law.

## A. Claims Against United

Essentially, Plaintiffs' claims in Counts IV and V for Breach of Contract and Fraudulent Misrepresentation are based upon a contention that United promised to protect Plaintiffs from harassment visited upon them by union members after the 1985 strike. As evidence of the cooperation promised by both United and ALPA, Plaintiffs have attached to their complaint both the "Back-to-Work Agreement" and the "Letter of Agreement," both of which constitute part of the collective bargaining agreement between ALPA and United. Thus, Plaintiffs themselves present portions of the CBA, presumably for the Court's use and interpretation.

An initial threshold issue that causes great concern for this Court is whether there is even a valid enforceable contract, as Plaintiffs wish this Court to understand it, based solely on a promise to "support," "protect" and "not forsake" them. As argued by United, there is no way that a court could determine from such general statements exactly what the promisor would be required to do. Rather, it appears that the actual promises and duties of United to confront the post-strike harassment are specifically addressed only in the context of the CBA. Furthermore, though the district court in *Fry v. Airline Pilots Ass'n.*, 147 L.R.R.M. 2776, 1994 WL 761045 (D.Colo.1994) seemed to accept the relevance of *Belknap, Inc. v. Hale*, 463 U.S. 491, 103 S.Ct. 3172, 77 L.Ed.2d 798 (1983) to the factual scenario presented by this case, this Court is not so readily convinced of its applicability. The doctrine of exclusivity embodied in *J.I. Case Co. v. National Labor Relations Board*, 321 U.S. 332, 64 S.Ct. 576, 88 L.Ed. 762 (1944) is the touchstone of the federal scheme of labor law that governs labor relations in this country. Once the striking workers returned to work under the newly negotiated collective bar-

gaining agreement the rights and duties of all parties, including Plaintiffs, regarding wages, hours and working conditions must be governed by that agreement and federal labor law would control.[1]

Beyond that initial threshold concern, and assuming arguendo that there is some independent contractual duty established, this Court must also agree with the district court's determination in *Fry*, that "whether United fulfilled its contracts and representations to protect the plaintiffs cannot be determined without understanding the disciplinary processes and remedies available to the plaintiffs through the various collective bargaining agreements." *Fry*, 147 L.R.R.M. at 2781. "Only by comparing the protective system put into place by the various labor agreements between United and the ALPA can the fact finder determine whether United's representations were false." *Id.* at 2781.

■ Additionally, Plaintiffs' claims would require an evaluation of whether United even had the contractual right under its collective bargaining agreement to discipline individual pilots for post-strike harassment. There is certainly the potential for the determinations and remedies established through the arbitral process agreed to by the parties to the CBA to conflict with determinations of a Court on the same issues. This is precisely the problem that is meant to be avoided by the doctrine of federal pre-emption in the labor law setting; therefore, the Court finds these claims pre-empted.

### B. Claims Against ALPA

■ "To prevail on a claim of tortious interference with a business relationship under Florida law, a plaintiff must establish four elements: '(1) the existence of a business relationship, not necessarily evidenced by an enforceable contract; (2) knowledge of the relationship on the part of the defendant; (3) an intentional and unjustified interference with the relationship; and (4) damage to the plaintiff as a result of the breach of the relationship.'" *T. Harris Young & Assoc. v. Marquette Electronics*, 931 F.2d 816, 825–26

(11th Cir.1991) (quoting *Tamiami Trail Tours, Inc. v. Cotton*, 463 So.2d 1126, 1127 (Fla.1985)). Essentially, a claim of tortious interference with a contract and a claim of tortious interference with a business relationship are one in the same. The only practical difference is that in the former there is a contract and in the latter only a business relationship.

■ Plaintiffs' claim for tortious interference with a contract in Count II and for tortious interference with a business relationship in Count III are both pre-empted in this case based upon the same analysis presented above for the claims against United. An essential element of the claim in either case would require proof of a "breach" of either the "contract" or "business relationship" by United and caused by ALPA. This determination cannot be made without turning to the various aspects of the CBA involved in getting the striking pilots back to work. Also, a proper analysis of the third element, an intentional and unjustified interference, would necessitate reference to what may or may not be "justified" actions taken or not by ALPA under the dictates of the CBA.

In addition to the foregoing rationale, this Court must agree with Judge Conlon's assessment of the propriety of a tortious interference claim in substantially the same factual setting. *See Rakestraw v. United Airlines, Inc.*, 765 F.Supp. 474, 496 (N.D.Ill. 1991), *aff'd in part, rev'd in part,* 981 F.2d 1524 (7th Cir.1992), *cert. denied,* —— U.S. ——, 114 S.Ct. 286, 126 L.Ed.2d 236 (1993). In that case, the judge found that the plaintiffs' claims against ALPA for tortious interference were fully encompassed in a claim for breach of the duty of fair representation.

■ In fact, prior to amending their complaint, Plaintiffs' federal cause of action in this case was just such a claim. Plaintiffs themselves chose to amend their complaint and remove the fair representation count. The choice of a cause of action does not change the facts of the case. "Where [a] state claim of tortious interference with [a]

---

1. Thus, following this rationale through, Plaintiffs' individual agreements, other than the initial permanent employment offer, were effectively subsumed within the framework of the ALPA/United CBA.

contract is 'essentially identical to the duty of fair representation claim ... the potential conflict between remedies and administration [of federal and state law] are too great to permit the state claims to stand." *Rakestraw* at 496 (quoting *Peterson v. Air Line Pilots Ass'n, Int'l,* 759 F.2d 1161, 1170–71 (4th Cir.1985), *cert. denied,* 474 U.S. 946, 106 S.Ct. 312, 88 L.Ed.2d 289 (1985)). Accordingly, it is

**ORDERED and ADJUDGED** that Defendants' Motions for Summary Judgement be **GRANTED** as set forth above and the Clerk of the Court be **DIRECTED** to enter judgment for Defendants on all Counts.

**DONE and ORDERED.**