**Geraldine WARE–ROBY, Plaintiff,**

v.

**BLUE CROSS–BLUE SHIELD, OF ILLINOIS, a.k.a. Health Care Services Corporation, Defendant.**

No. 96 C 4948.

United States District Court,
N.D. Illinois,
Eastern Division.

Feb. 12, 1998.

Armand L. Andry, Law Offices of Armand L. Andry, Oak Park, IL, for Plaintiff.

Joel Reid Skinner, Health Care Services Corp., Carolyn Clift, Blue Cross–Blue Shield of Illinois, Health Care Service Corp., Roger L. Taylor, Marc J. Zwillinger, Maria Ticsay, Kirkland & Ellis, Thomas C. Lubben, Health Care Service Corp., Chicago, IL, for Defendant.

## MEMORANDUM OPINION AND ORDER

BUCKLO, District Judge.

The plaintiff, Geraldine Ware–Roby, filed suit against the defendant, Blue Cross–Blue Shield of Illinois ("Blue Cross"), under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.,* and the Civil Rights Act of 1991, 42 U.S.C. § 1981. Ms. Ware–Roby claims she was fired because of her race, African–American, and in retaliation for complaining to Blue Cross' Equal Employment Opportunity ("EEO") Department about her supervisor's alleged discriminatory behavior. Blue–Cross moves for summary judgment. For the following reasons, the motion is denied.

### Background

Ms. Ware–Roby worked for Blue Cross for over sixteen years before her termination in June, 1996. Blue Cross is a provider of health insurance. In Fall, 1994, Ms. Ware–Roby applied for the position of senior account executive in the National Accounts Marketing Division of Blue Cross. She was interviewed and subsequently hired by James Dalton, a senior account manager. Ms. Ware–Roby began her new job in October, 1994. Mr. Dalton became her supervisor. Ms. Ware–Roby was assigned to service Blue Cross' United Parcel Service ("UPS") account. Mr. Dalton and Ms. Barbara Walsh, a principal account executive, also serviced the UPS account.

Ms. Ware–Roby's main task as a senior account executive was to act as the primary Blue Cross contact for UPS. Ms. Ware–Roby was expected to establish a rapport with UPS, solve problems, implement sales, and gain a broad knowledge of the industry and UPS. (Pl.Ex.1). In February, 1995, Mr. Dalton gave Ms. Ware–Roby her first performance evaluation. (Pl.Ex.2). Mr. Dalton found Ms. Ware–Roby fell short of the required skill level in ten of twenty-seven areas of evaluation. She exceeded the required skill level in two categories. Ms. Ware–Roby received an overall performance rating of "3," indicating the desired results of her job were "consistently met." *Id.*

According to Mr. Dalton, at some point after the February, 1995 performance evaluation, he began to feel Ms. Ware–Roby was not meeting the performance expectations of a senior account executive. Blue Cross suggests Mr. Dalton started "coaching" Ms. Ware–Roby to help train her and held periodic performance reviews. Ms. Ware–Roby, however, disputes these assertions. She indicates Mr. Dalton never informed her he was unsatisfied with her work until March, 1996.

In February, 1996, Ms. Ware–Roby received her second evaluation as a senior account executive. Ms. Ware–Roby was rated below the skill level required in fourteen of the twenty-seven evaluated categories. (Df.Ex.7). Mr. Dalton found that Ms. Ware–Roby's "level of contribution to account management is not at the level it should be after 15 months in this position." *Id.* Ms. Ware–Roby again received an overall performance

rating of "3." She did not receive a salary increase. When Ms. Ware–Roby learned she was not receiving a salary increase, she complained to Blue Cross' internal EEO Department that white senior account executives who received an overall performance rating of "3" were getting raises.

On March 6, 1996, Mr. Dalton and Ms. Ware–Roby met to discuss the performance evaluation. Mr. Dalton informed Ms. Ware–Roby her performance was unsatisfactory and she had been rated a "3" instead of a "2" so that she would be able to seek other positions within the company. Ms. Ware–Roby refused to sign the evaluation and drafted a rebuttal memo indicating she had not been given clear goals or informed her work was unsatisfactory. (Df.Ex.8). On March 14, 1996, Mr. Dalton officially gave Ms. Ware–Roby a verbal warning regarding her performance. On March 19, 1996, Ms. Ware–Roby filed a formal written complaint with Blue Cross' EEO Department complaining she was being discriminated against because she was African–American and was being harassed based on her previous contact with the EEO Department. (Df.Ex.9).

On March 25, 1996, Ms. Ware–Roby received a memo titled "Verbal Warning Due to Performance Problems." (Df.Ex.3). The memo reduced Ms. Ware–Roby's verbal warning to writing. The memo recounted Ms. Ware–Roby's performance deficiencies and assigned her fourteen performance objectives to meet over the following four weeks. The memo stated that failure to meet the performance objectives could result in further disciplinary action. On April 24, 1996, Mr. Dalton gave Ms. Ware–Roby a memorandum titled "Documented Warning/Probation Due to Performance Problems." The memo documented Ms. Ware–Roby's failure to meet her performance objectives and marked the beginning of a thirty day probation period. Ms. Ware–Roby was to meet the performance objectives during the probationary period.

On April 26, 1996, Ms. Ware–Roby filed a charge of race discrimination and retaliation with the Illinois Department of Human Rights and the Equal Employment Opportunity Commission. During May, 1996, Mr. Dalton twice extended Ms. Ware–Roby's probation period. On June 13, 1996, Ms. Ware–Roby was terminated.

### Race Discrimination[1]

Ms. Ware–Roby argues Blue Cross discriminated against her because she is African–American. Ms. Ware–Roby has not presented any direct evidence of discrimination and thus, must proceed under the burden-shifting analysis of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Ms. Ware–Roby must first establish a prima facie case of discrimination by showing: (1) she belongs to a protected class, (2) she performed her job satisfactorily, (3) she suffered an adverse employment action, and (4) Blue Cross treated similarly-situated employees outside her classification more favorably. *Plair v. E.J. Brach & Sons, Inc.*, 105 F.3d 343, 347 (7th Cir.1997); *Denisi v. Dominick's Finer Foods, Inc.*, 99 F.3d 860, 864 (7th Cir.1996). If Ms. Ware–Roby makes out a prima facie case of discrimination, the burden of production shifts to Blue Cross to articulate a "legitimate, nondiscriminatory reason for its action." *Plair*, 105 F.3d at 347. Should Blue Cross meet the burden of showing a nondiscriminatory reason for Ms. Ware–Roby's termination, the burden shifts back to Ms. Ware–Roby to show Blue Cross' explanation is simply a pretext for discrimination. *McDonnell Douglas Corp.*, 411 U.S. at 804; *Denisi*, 99 F.3d at 864.

Ms. Ware–Roby easily meets three prongs of the prima facie case. She is an African–American who was terminated from her job at Blue Cross. Further, other senior account executives, all Caucasian, performing substantially similar duties, were not fired.[2]

Blue Cross argues, however, that, based on Ms. Ware–Roby's inadequate job perfor-

---

**1.** Section 1981 claims are analyzed in the same manner as Title VII claims. *Bratton v. Roadway Package Sys., Inc.*, 77 F.3d 168, 176 (7th Cir. 1996).

**2.** Blue Cross argues Ms. Ware–Roby does not meet the fourth prong of the prima facie case because no employees were performing as poorly

as Ms. Ware–Roby and thus, no "similarly-situated" employees were treated more favorably when Ms. Ware-performing as poorly as Ms. Ware–Roby and thus, no "similarly-situated" employees were treated more favorably when Ms. Ware–Roby was fired. Blue Cross defines "similarly-situated" too narrowly, merging the fourth

mance, she cannot make out a prima facie case of discrimination and even if she could, there existed legitimate, nondiscriminatory reasons for her termination. To this end, Blue Cross presents Mr. Dalton's testimony indicating Ms. Ware–Roby did not perform up to his expectations in the role of senior account executive. (Dalton Dep. at 93). Mr. Dalton found Ms. Ware–Roby was the least effective senior account executive he reviewed. (Dalton Dep. at 92). Ms. Walsh also noted that she received numerous calls from "HR managers" indicating Ms. Ware-Roby was not effectively performing her job. (Df.Ex.4).[3] Ms. Ware–Roby admitted her February, 1996 review was a "negative review" and, overall, an unsatisfactory review, but maintains the review did not accurately reflect her performance. (Ware–Roby Dep. at 85–86).

Blue Cross argues that Mr. Dalton spent from March to June "coaching" Ms. Ware–Roby and attempting to improve her performance, all to no avail. Blue Cross, however, does not present testimony such meetings occurred. Instead, it offers a copy of Ms. Ware–Roby's April 24, 1996 probation memo which summarily states weekly meetings took place. The memo does not discuss the purposes of the meetings or what actually occurred at the meetings. (Df.Ex. 10 at 278). Ms. Ware–Roby's affidavit indicates meetings were held from March to June, but the meetings were brief and Mr. Dalton did not coach her. (Pl.Ex. 1 ¶ 22). Instead, Mr. Dalton would simply ask if Ms. Ware–Roby had any questions and then, more often than not, revise what he wanted from Ms. Ware–Roby. *Id.* If Mr. Dalton, Ms. Ware–Roby's supervisor, did not help Ms. Ware–Roby improve what Blue Cross argues was a deficient

performance, a reasonable inference may be drawn that Ms. Ware–Roby's performance was not as unsatisfactory as Blue Cross has indicated.

Blue Cross also argues Ms. Ware–Roby's February, 1996 evaluation is evidence Ms. Ware–Roby was not performing satisfactorily. Ms. Ware–Roby failed to meet the required skill level in fourteen of twenty-seven categories. (Df.Ex.7). Mr. Dalton states on the review that Ms. Ware–Roby was not contributing to account management at the level she should be after fifteen months as a senior account executive. Still, Ms. Ware–Roby received an overall rating of "3," indicating she had consistently met the desired results of her job. *Id.* A Divisional Vice President for Blue Cross testified that "[i]t should be expected that an employee with three [sic] are going to be the majority of the people within the organization. They are doing their job." (Betzold Dep. at 18).

Blue Cross counters this argument by noting Mr. Dalton informed Ms. Ware–Roby the "3" rating was a courtesy so that Ms. Ware–Roby could get another job at Blue Cross and that she really deserved a "2." This contention raises more questions than it answers. First, it indicates Ms. Ware–Roby was performing well enough to continue working for Blue Cross in some position. Second, if certain senior account managers believe a "3" rating is actually a "2" rating or perhaps vice versa, it calls into question all Blue Cross performance evaluations. It allows Blue Cross to perpetually present post hoc rationalizations for employee evaluations that are numerically inconsistent with a decision to terminate an employee.

"Credibility determinations, the weighing of the evidence, and the drawing of legiti-

---

prong of the prima facie case into its right to show Ms. Ware–Roby was not performing her job satisfactorily and that there were legitimate, nondiscriminatory reasons for her termination. *Tonella v. Environmental Sys. Design, Inc.,* No. 96 C 103, 1997 WL 112837, at *6–7 (N.D.Ill. Mar.10, 1997). Ms. Ware–Roby need only show that non–African–Americans, responsible for the same duties as herself, were not fired. Ms. Ware–Roby has done so by pointing to Michael Chmielewski and Laura Ritter.

**3.** Blue Cross argues Ms. Walsh, like Mr. Dalton, was Ms. Ware–Roby's supervisor on the UPS

account and she also found Ms. Ware–Roby's performance deficient. Ms. Walsh's opinion of Ms. Ware–Roby's work is only relevant if Ms. Walsh was Ms. Ware–Roby's supervisor or was influential in Ms. Ware–Roby's termination. Ms. Walsh admits she was not Ms. Ware–Roby's supervisor, did not prepare the performance evaluations, and never informed Mr. Dalton of her opinion as to whether Ms. Ware–Roby should be terminated. (Walsh Dep. at 49, 59–60). Accordingly, only Ms. Walsh's direct testimony regarding specific aspects of Ms. Ware–Roby's work is relevant.

mate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (citation omitted). All "justifiable inferences" are to be drawn in favor of Ms. Ware–Roby. *Id.* Based on the evidence, there is a genuine issue of fact as to whether Ms. Ware–Roby was satisfactorily performing her job at the time of her termination. Although Ms. Ware–Roby may have an uphill battle in proving she was meeting Blue Cross' employment expectations, this determination is best left for the trier of fact.

Since Ms. Ware–Roby has made out a prima facie case of discrimination, the burden of production shifts to Blue Cross to present a legitimate, nondiscriminatory reason for her termination. Blue Cross states Ms. Ware–Roby was terminated because her job performance was unsatisfactory. This is a legitimate, nondiscriminatory explanation for Ms. Ware–Roby's termination. Thus, the burden shifts to Ms. Ware–Roby to prove Blue Cross' proffered explanation for her termination is pretext.

■ A pretext is "a lie, specifically a phony reason for some action." *Russell v. Acme-Evans Co.*, 51 F.3d 64, 68 (1995). "To show that an employer's reasons are pretext, an employee may show (1) that the employer was more likely motivated by a discriminatory reason, or (2) that the employer's proffered reason is unworthy of credence." *Karazanos v. Navistar Int'l Transp. Corp.*, 948 F.2d 332, 336 (7th Cir.1991). Blue Cross' proffered reason for Ms. Ware–Roby's termination is that she was not performing her job satisfactorily. Certainly there is evidence that indicates Ms. Ware–Roby was not meet-

ing Mr. Dalton's performance expectations. But there is also evidence from which a jury could infer Ms. Ware–Roby was performing her job satisfactorily. Ms. Ware–Roby received an overall rating performance of "3," and she presents evidence she was not told of her alleged performance deficiencies until February, 1996, and was never aided in improving her alleged poor performance.[4]

In order to prove Ms. Ware–Roby had ongoing performance problems Blue Cross relies almost entirely on Mr. Dalton's March 25, 1996 memo indicating Mr. Dalton informed Ms. Ware–Roby on an ongoing basis that he was not pleased with her performance. (Df.Ex.3). But Blue Cross has not presented any testimony supporting the memo other than conclusory allegations that Ms. Ware–Roby was an ineffective senior account executive. Ms. Ware–Roby states she was completely unaware of the alleged work deficiencies and that Mr. Dalton never complained about her work until March, 1996, after she spoke with the EEO Department about not receiving a raise. Blue Cross counters that simply because Ms. Ware–Roby was unaware of her poor performance does not mean it did not exist. While this is undoubtedly true, an inference may be drawn that Blue Cross never informed Ms. Ware–Roby of her alleged performance deficiencies because they did not exist, indicating Blue Cross' motive for firing Ms. Ware–Roby is pretext. Blue Cross might be able to rebut this inference if it presented significant documentation indicating Ms. Ware–Roby's performance was deficient before her February, 1996 evaluation. It did not. Thus, which inference is the proper one to draw from this evidence is appropriately left for the trier of fact.[5]

---

**4.** Blue Cross argues that even if Mr. Dalton thought Ms. Ware–Roby was deserving of a "3" there is no law that prohibits an employer from firing an employee who is not excelling. *Timm v. Mead Corp.*, 32 F.3d 273, 275–76 (7th Cir. 1994). It is true that "[i]f an employer genuinely expects a competent employee to be better than competent and fires him for not excelling, the employer's conduct is, for purposes of the federal employment discrimination law, adequately explained." *Id.* at 275. But Blue Cross has presented no evidence that it "genuinely" expected anything of Ms. Ware–Roby other than her consistently meeting the desired results of her job, that is, being rated a "3." One Blue Cross

Divisional Vice President testified that an employee receiving a "3" was "doing their job." (Betzold Dep. at 18). Further, Mike Chmielewski, another senior account executive, received an overall rating of "3" in his February, 1996 evaluation and was not terminated, indicating Blue Cross did not expect its senior account executives to excel beyond an overall rating of "3."

**5.** Blue Cross is correct in stating there is a strong inference an employee was not fired for discriminatory motives when the same individual both hires and fires the employee. *Rand v. CF Indus., Inc.*, 42 F.3d 1139, 1147 (7th Cir.1994). It

Blue Cross also argues that even if Ms. Ware–Roby was performing satisfactorily in February, 1996, she failed to meet her performance objectives during April, May, and June, and thus, her termination was justified. Ms. Ware–Roby argues that during her performance improvement period she was assigned work that was not senior account executive work and work for which she was not trained. (Pl.Ex.A.¶ 20). According to Ms. Ware–Roby, when she told Mr. Dalton she was not trained to do the work assigned he told her to do the work anyway. *Id.* To be legitimate, Blue Cross' employment expectations need only be objectively reasonable and adequately communicated to Ms. Ware–Roby. *Mills v. First Fed. Savings & Loan Ass'n of Belvidere*, 83 F.3d 833, 844 n. 7 (7th Cir.1996). Blue Cross argues that Ms. Ware–Roby's performance objectives were required of other senior account executives and thus, were reasonable. But it does not appear that the work required of Ms. Ware–Roby was required of all senior account executives. (Df.Ex.27). Regardless of what was expected of other senior account executives, it was not objectively reasonable to expect Ms. Ware–Roby to complete performance objectives she was not trained to accomplish. It is noteworthy that Laura Ritter, who was also assigned performance objectives, was given four months to complete her objectives while Ms. Ware–Roby was initially given only four weeks to complete her performance objectives. (Df.Exs.3, 25).

■ Ms. Ware–Roby argues that Blue Cross' explanation is pretext because Blue Cross did not follow Management Guidelines in disciplining her. Blue Cross' "Discipline Guidelines" indicate that evaluators "should not wait until formal appraisal time to issue a documented warning in the form of an unsatisfactory rating." (Pl.Ex.D). According to Ms. Ware–Roby, Blue Cross waited until her February, 1996 evaluation to indicate it found her work unsatisfactory. (Df.Ex.8). Blue Cross argues that a simple breech of company protocol does not mean Ms. Ware–Roby was performing satisfactorily and thus, does not prove pretext. This inference may be drawn from Blue Cross' failure to follow company guidelines. An inference may also be drawn, however, that Blue Cross did not follow its guidelines in disciplining Ms. Ware–Roby because Ms. Ware–Roby did not need disciplining. Blue cross argues that the former inference is more logical and thus, summary judgment should be granted. It is for the trier of fact and not this court, however, to determine which inference is best drawn from the evidence.

Ms. Ware–Roby also notes that Mr. Dalton had never given a senior account executive an overall rating of "3" and then given them a written warning or placed them on probation. (Dalton Dep. at 64, 72). Again, two inferences can be drawn from this evidence. Either Mr. Ware–Roby was not meeting her employer's expectations and the overall rating of "3" was generous, or Ms. Ware–Roby deserved the overall rating she received and Mr. Dalton had other, perhaps discriminatory reasons, for giving Ms. Ware–Roby a written warning and placing her on probation. Blue Cross argues that this evidence and common sense indicate Ms. Ware–Roby never deserved the "3" rating. Again, which inference is appropriate is best left for the trier of fact.[6]

There is a genuine issue of fact as to whether Blue Cross' proffered explanation for Ms. Ware–Roby's termination was pretext. While the evidence yields a number of inferences that indicate Blue Cross sincerely believed Ms. Ware–Roby was not performing adequately, the evidence also indicates Ms. Ware–Roby was performing at the desired level and was fired for other reasons. Sum-

seems illogical that Mr. Dalton would hire Ms. Ware–Roby and then develop a bigotry towards African–Americans that would motivate her firing. Still, this inference is but one of many the trier of fact could draw from the evidence. As such, it is not determinative of the issues in controversy.

**6.** Ms. Ware–Roby also notes that Mr. Dalton informed her she was assigned work that neither Michael Chmielewski nor Laura Ritter, both senior account executives, were capable of completing. (Pl.Ex. A ¶ 11). Ms. Ware–Roby completed the work the other senior account executives could not handle. Ms. Ware–Roby, Mr. Chmielewski, and Ms. Ritter all received overall ratings of "3." Yet only Ms. Ware–Roby was given a written warning and placed on probation, further indicating Blue Cross' argument that she not performing satisfactorily is pretext.

mary judgment on Ms. Ware–Roby's race discrimination claims is denied.

### Retaliation

Ms. Ware–Roby also claims Blue Cross discriminated against her after she complained to the EEO Department in February, 1996, about not getting a raise. Since Ms. Ware–Roby offers no direct evidence of retaliation, her claim will again be analyzed using the *McDonnell Douglas* burden-shifting formula. To make out a prima facie case of retaliation, Ms. Ware–Roby must show that "(1) she engaged in statutorily protected expression; (2) she suffered an adverse action by her employer; and (3) there is a causal link between the protected expression and the adverse action." *Holland v. Jefferson Nat'l Life Ins. Co.*, 883 F.2d 1307, 1313 (7th Cir.1989). Ms. Ware–Roby easily meets the first two prongs of the prima facie case. Ms. Ware–Roby states she complained to Rita Taylor–Nash in Blue Cross' EEO Department in February, 1996, after learning she would not be getting a raise although she received a "3" on her performance evaluation. Ms. Ware–Roby informed Ms. Taylor–Nash she believed this was discriminatory treatment since other senior account executives earning a "3" rating, all of whom were Caucasian, were receiving raises. (Pl.Ex. A ¶ 15). This was statutorily protected speech. Subsequently, Ms. Ware–Roby was fired.

"Generally, a plaintiff may establish a [causal] link through evidence that the [adverse employment action] took place on the heels of protected activity." *Dey v. Colt Constr. & Dev. Co.*, 28 F.3d 1446, 1458 (7th Cir.1994). Ms. Ware–Roby complained to Ms. Taylor–Nash in February, 1996. Ms. Taylor–Nash told Ms. Ware–Roby she would contact Mr. Dalton to explore Ms. Ware–Roby's claim. (Pl.Ex. A ¶ 15). Mr. Dalton cannot remember when he was first contacted regarding Ms. Ware–Roby's EEO claim. (Dalton Dep. at 68). But after Ms. Ware–Roby complained to the EEO Department in February, 1996, Mr. Dalton gave Ms. Ware–Roby a verbal warning, then gave her a written warning, placed her on probation, and ultimately terminated her.

Blue Cross suggests Ms. Ware–Roby did not officially complain to the EEO Department until March 19, 1996, when Ms. Ware–Roby filed a written employee complaint report. (Df.Ex.9). Since Mr. Dalton had already noted Ms. Ware–Roby's performance deficiencies before March 19, 1996, Blue Cross argues that any adverse action taken against Mr. Ware–Roby occurred before Mr. Dalton was aware a complaint had been filed and thus, could not have been retaliatory. This argument assumes that since Mr. Ware–Roby did not file a written report with Ms. Taylor–Nash in February, 1996, Mr. Dalton must not have known there was a complaint against him. But Ms. Ware–Roby's March 19, 1996 written complaint indicates she had previously complained to the EEO Department about Mr. Dalton's actions and, based on Mr. Dalton's behavior since Ms. Ware–Roby's February complaint, she believed she was being retaliated against. (Df.Ex.9). A trier of fact could find Ms. Ware–Roby complained to the EEO Department in February, 1996, Mr. Dalton was informed of this complaint, and subsequently gave Ms. Ware–Roby a verbal warning, a written warning, placed her on probation, and fired her. This occurred all within a span of four months.

Thus, a reasonable fact finder could conclude there was a causal connection between Ms. Ware–Roby's February, 1996 complaint to the EEO Department and her subsequent discipline by Mr. Dalton. Ms. Ware–Roby has made out a prima facie case of retaliation. As before, Blue Cross presents Ms. Ware–Roby's work deficiencies as a legitimate, nondiscriminatory reason for her discipline and termination. And, as before, Ms. Ware–Roby presents evidence that would permit a trier of fact to find Blue Cross' proffered explanation is pretext. Accordingly, summary judgment is denied on Ms. Ware–Roby's retaliation claim.

### Conclusion

Ms. Ware–Roby presents evidence sufficient to make out a prima facie case of race discrimination and retaliation. Blue Cross has submitted a legitimate, nondiscriminatory explanation for her termination. Ms. Ware–Roby has countered with evidence that, taken in the light most favorable to her, would allow a reasonable finder of fact to conclude Blue Cross' proffered explanation

for her termination is pretext. Accordingly, Blue Cross' motion for summary judgment is denied.