**Wanda RAGLAND, Plaintiff,**

v.

**ROCK–TENN COMPANY and Carol D'Andrea, Defendants.**

No. 96 C 0081.

United States District Court, N.D. Illinois, Eastern Division.

March 14, 1997.

William B. Thompson, Wheaton, IL, for Wanda Ragland.

Larry E. Forrester, Suzanne J. Mulliken, Smith, Currie & Hancock, Atlanta, GA, Louis Theros, Dickinson, Wright, Moon, Van Dusen & Freeman, Chicago, IL, for Rock–Tenn Co.

## MEMORANDUM OPINION AND ORDER

CASTILLO, District Judge.

Plaintiff Wanda Ragland filed suit in this Court alleging that her former employer, Rock–Tenn Company, and former supervisor, Carol D'Andrea, discriminated against her on the basis of age. Ragland contends that she was meeting Rock–Tenn's legitimate expectations in her capacity as a customer service representative; but nevertheless, the company terminated her after just eight months in that position and replaced Ragland with someone many years her junior. Having allegedly received no complaints until she was fired, and upon discovering Rock–Tenn's alleged attempt to prompt the resignation of a fifty-year-old co-worker, Ragland concluded that age was behind her discharge. After receiving a Notice of Right to Sue from the EEOC, she proceeded to file a three-count complaint: Count I claims that Ragland's termination violated the Age Discrimination in Employment Act, 29 U.S.C. §§ 621 *et seq.;* Count II alleges that her dismissal breached a contract for continued employment; and Count III claims Ragland was defamed by statements that Rock–Tenn management made following her termination. Defendants Rock–Tenn and Carol D'Andrea vigorously deny these charges, and have moved for summary judgment on all counts.

### RELEVANT FACTS

■ We start by presenting the facts in the light most favorable to the plaintiff.[1] *See*

---

1. The facts are derived from statements that the parties filed with this Court under the Northern District of Illinois' Local General Rule 12(M)-(N). Rule 12(M)(3) requires a party moving for summary judgment to file "a statement of material facts as to which the moving party contends there is no genuine issue." The movant's statement must contain "specific references to affidavits, parts of the record, and other supporting materials relied upon to support the facts set forth." Rule 12(M)(3). Rock–Tenn and D'Andrea's statement is cited as "Defs.' Facts ¶ ——." Similarly, Rule 12(N)(3)(a) requires the non-moving party to file a concise response to the movant's statement including, in the case of any disagreement, specific references to supporting materials. Ragland's response is cited as "Pl.'s Facts ¶ ——." Rule 12(N)(3)(b) authorizes the non-moving party to submit a statement of "additional facts that require the denial of summary judgment"; under Rule 12(M), the moving party

may then submit a reply to the non-moving party's additional facts. Ragland's statement of additional facts is cited as "Pl.'s Add'l Facts ¶ ——" and the defendants' reply is cited as "Defs.' Resp. Add'l Facts ¶ ——." All properly supported material facts set forth in either party's statement (i.e., Defs.' Facts or Pl.'s Add'l Facts) are deemed admitted unless properly controverted. *See* Local Rule 12(M) and 12(N)(3)(b); *see also Flaherty v. Gas Research Inst.,* 31 F.3d 451, 453 (7th Cir.1994); *Waldridge v. American Hoechst Corp.,* 24 F.3d 918, 921–22 (7th Cir.1994); *Stewart v. McGinnis,* 5 F.3d 1031 (7th Cir.1993). Moreover, the mere denial of a particular fact without specific references to the "affidavits, parts of the record, and other supporting materials" is insufficient, and, where a properly supported factual assertion is met with such a naked denial, the fact may be deemed admitted. *Flaherty,* 31 F.3d at 453.

*Wolf v. Buss America, Inc.,* 77 F.3d 914, 918 (7th Cir.1996). Ragland began her career with Rock–Tenn in its Hillside, Illinois Paperboard Packaging Sales Office. Defs.' Facts ¶ 5. She joined the company as a sales service secretary in 1988, at the age of 46. *Id.* Handling clients, entering customer orders and doing customer service were Ragland's primary responsibilities. Pl.'s Add'l Facts ¶ 3. The job also entailed answering phones. Ragland Dep. p. 13. In 1992, Rock–Tenn decided to close its Hillside office and move operations to Michigan. Defs.' Facts ¶ 6. The parties differ on Ragland's prospects after the closing, but agree that she eventually applied for a position with Rock–Tenn's Chicago Plastics Division in Franklin Park, Illinois. *Id.;* Pl.'s Facts ¶ 6.

According to Ragland, one of her superiors at the Hillside office suggested that she contact Carol D'Andrea, the Customer Service Manager at the Chicago Plastics Division, because "Rock–Tenn did not want to lose someone with her performance level." Pl.'s Facts ¶ 6. Ragland called D'Andrea, who agreed to interview Ragland for a position in customer service. Pl.'s Add'l Facts 11; Defs.' Fact ¶ 7. The substance of that interview is hotly disputed. Ragland claims that D'Andrea never disclosed the specific attributes of the position, revealing only that she would begin by billing and invoicing on customers' accounts receivable, then move on to "perform the duties of a customer service representative." Pl.'s Facts ¶ 7; Pl.'s Add'l Facts ¶¶ 9–10. In particular, D'Andrea never told Ragland that she would be expected to answer phones as part of the job. Pl.'s Facts ¶ 7. Defendants, however, maintain that D'Andrea detailed Rock–Tenn's expectations, explaining that Ragland would first be trained in invoicing, then taught more advanced accounts receivable functions, and finally receive customer service training. Defs.' Facts ¶ 7. The defendants also claim that D'Andrea made clear that, as a customer service representative, Ragland would need to answer phones. *Id.*

D'Andrea hired Ragland, at age fifty, for the customer service position in Franklin Park. Defs.' Facts ¶ 7. She began work in January 1993, but retained, for seniority purposes, her original 1988 date of hire. *Id.* ¶¶ 7, 10. Once in Franklin Park, Ragland worked under the supervision of D'Andrea, who in turn reported to Dick Korff, the office's General Manager. Defs.' Facts ¶ 10. From the beginning of her tenure at Franklin Park, Ragland claims she performed both the invoicing and customer service functions. Pl.'s Add'l Facts ¶ 12. Indeed, she was trained in both. Ragland Dep. pp. 24–25. Although Ragland's responsibilities had diminished from her days at the Hillside office to the point where she was primarily "doing billing and invoicing," Ragland also answered phones along with the rest of the customer service employees. Pl's Add'l Facts ¶¶ 11, 15.

The point where the parties diverge most sharply is on the quality of Ragland's performance at Franklin Park. By Ragland's account, it was smooth, practically without incident. Defendants, on the other hand, claim that Ragland's employment was marked by numerous failings. The problems, defendants say, began with Ragland's work hours. It is undisputed that, in May 1993, Ragland requested to work on a flex schedule, from 10:00 a.m. to 7:00 p.m., in order to facilitate her commute to and from work. Defs.' Facts ¶ 11. D'Andrea permitted the change in hours because, she says, Ragland had made a habit of coming in late. Defs.' Resp. Add'l Facts ¶ 19. Nevertheless, all the other customer service representatives were required to be in the office from 8:00 a.m. to 5:00 p.m. because that was the time frame during which customers would call to place or confirm orders. Defs.' Facts ¶ 11. Ragland's absence during the peak hours of 8:00 a.m. to 10:00 a.m. was problematic because it imposed Ragland's share of the work on the other employees. *Id.* ¶ 12. Ragland's peers felt, as a result, that she was being singled out for favorable treatment, and they registered their dissatisfaction with D'Andrea. *Id.;* Nancy Dahl Aff. ¶ 4; Lilly Gandar Aff. ¶ 2.

Defendants also maintain that Ragland's tardiness continued on the revised schedule. Defs.' Resp. Add'l Facts ¶¶ 22–23. D'Andrea says she constantly reprimanded Ragland for arriving late and leaving early. *Id.* ¶ 19. To

support their allegations of tardiness, defendants present no documentary evidence, but rely on affidavits executed by several Rock–Tenn employees. *See* Defs.' Facts Exs. A–G.

Ragland's response to these claims is threefold: the flex schedule was not a function of tardiness; it did not result in complaints or extra work for others; and the eight to five schedule was not set in stone. First, while Ragland admits that she worked from ten to seven by request, she attributes the altered schedule to the fact that she had been arriving at eight and staying until six or seven to avoid rush-hour traffic. Pl.'s Add'l Facts ¶ 20. She denies that she was tardy on either schedule, or that she ever left early. *Id.* ¶¶ 45, 60; Ragland Aff. ¶¶ 20h.-j. Second, Ragland claims that her schedule never inconvenienced other employees or provoked their complaints. Pl.'s Add'l Facts ¶¶ 19, 22, 23, 33. She insists that her co-workers did not have to pick up the slack caused by her absence from eight to ten and that the customer service department would have functioned just as well if no representatives began work until 10 a.m. *Id.* ¶¶ 27, 34. In addition, Ragland claims that no one could have registered complaints with D'Andrea about her flex schedule because Ragland was not informed of them. Pl's Facts ¶ 12. In fact, other employees benefitted from her later hours: Lilly Gandar called in one evening after five to check on a lost item, and told Ragland she was glad Ragland was there; Richard Korff regularly phoned between five and seven to discuss business matters. *Id.* ¶¶ 31–32.

Ragland's third response to defendants' tardiness allegations is that an eight to five schedule was not crucial to Rock–Tenn's operation. She maintains that the phones continued ringing past five and were not, as defendants claim, routed to an answering machine. *Id.* ¶ 11. Moreover, Maria Maniak, a younger employee who Ragland says worked full time as a customer service representative, was permitted to arrive after eight and leave before five—a schedule even more liberal than Ragland's. *Id.* ¶ 12. Defendants, however, state that Maniak worked in inventory control, not customer service, and, as such, did not have to be around during

business hours to answer phones. Defs.' Facts ¶ 12 n. 1; Defs.' Resp. Add'l Facts ¶ 24. Ragland supports each of these conclusions with her own deposition and affidavit, but offers no corroborating documentary evidence or testimony from other employees.

Besides Ragland's alleged tardiness and troublesome schedule, defendants specify two performance problems that led to her discharge. Defendants claim that Ragland practiced poor phone etiquette and could not fulfill many of the functions she was hired to perform. They cite examples of each deficiency. In February 1993, D'Andrea asked Ragland to increase her work pace because she was able to perform only the invoicing part of her job, leaving D'Andrea to assume several of Ragland's accounts receivable and customer service duties. Defs.' Facts ¶ 13. Ragland denies that her capabilities were so limited or that D'Andrea complained about them. Pl.'s Add'l Facts ¶ 13. In May 1993, D'Andrea counseled Ragland for failing to log customer invoices on a timely basis. Defs.' Resp. Add'l Facts ¶ 18. Specifically, she told Ragland that credits should be recorded immediately and that customers complained when they were not credited promptly. *Id.* ¶ 66. Ragland admits that D'Andrea counseled her about logging and credits, but states that D'Andrea's comments were meant to educate Ragland about a new procedure, not criticize her performance. Pl.'s Add'l Facts ¶ 18. Ragland also denies that D'Andrea raised timeliness concerns. *Id.* ¶¶ 66–67.

With respect to Ragland's telephone conduct, defendants claim that Ragland initially refused to answer the phones, and when she did begin taking calls, she behaved poorly. Dick Korff testified that Ragland consistently relayed names incorrectly when transferring calls and taking messages. Defs.' Resp. Add'l Facts ¶ 79. Korff discussed this with D'Andrea, but mentioned nothing to Ragland. *Id.* Terrence Dane, one of Rock–Tenn's national account managers, testified that he received numerous complaints from customers objecting to Ragland's rude telephone manners. *Id.* ¶ 77. He, like Korff, went straight to D'Andrea instead of telling Ragland he was dissatisfied. *Id.* D'Andrea,

however, claims that she brought these complaints to Ragland's attention as early as March 1993, when she counseled Ragland about her phone manners and efficiency. *Id.* ¶ 16. In response, Ragland admits that, on one occasion, she mispronounced the name of a doctor who was treating Korff's wife in the hospital, but asserts that Korff himself would have fared no better with the name. Pl.'s Add'l Facts ¶ 79. She disputes Dane's allegations of discourteousness with the fact that Dane joined the company just one month before Ragland's termination, and therefore lacked a stable of customers who could have complained about her. *Id.* ¶ 77. Finally, Ragland denies that D'Andrea ever told her that answering the phones was a job requirement for customer service, or talked to Ragland about deficient phone skills before she was fired. *Id.* ¶¶ 14, 16–17.

In light of these alleged shortcomings, D'Andrea and Korff did not believe that Ragland was performing up to Rock–Tenn's standards. Defs.' Resp. Add'l Facts ¶ 54. Although neither one documented Ragland's poor performance, D'Andrea says she counseled Ragland about tardiness and performance problems on "numerous occasions," and that she discussed Ragland's failings with Korff regularly. *Id.* ¶ 42; Defs.' Fact ¶ 16. Ragland responds that, on the contrary, her work was professional and satisfied Rock–Tenn's legitimate expectations. Ragland Aff. ¶ 6. She denies that she was ever tardy or had performance problems. *Id.* ¶ 21.d. Moreover, no one ever told her that she needed to improve in these areas. Pl.'s Add'l Facts ¶ 42.

To prove her competence, Ragland relies on examples of co-workers' and a customer's general satisfaction. In June 1993, Ragland claims that James Jackson, a senior Rock–Tenn salesman, orally rated her performance "great." Ragland Aff. ¶ 2. Between February and August, representatives of Baxter Co., the client with whom she had the most contact, told Ragland she was doing a "good job" on their account. *Id.* ¶ 3. And in March 1993, one of Ragland's fellow customer service representatives, Lilly Gandar, told a vacationing D'Andrea that Ragland "was in control of the office and doing a good job."

*Id.* ¶ 16. The sole source of this information is Ragland's affidavit; she did not submit testimony or affidavits from Jackson or from Baxter Co. representatives. Gandar's affidavit, provided by defendants, mentions only that Ragland's performance was sub-par. *See* Gandar Aff. ¶¶ 2–3.

On August 24, 1993, just eight months after Ragland began working at the Franklin Park Office, Korff, D'Andrea, and Rock–Tenn's Human Resources Manager collectively decided to terminate Ragland. Defs.' Facts ¶ 17. D'Andrea told Ragland that she was being discharged for the following reasons: 1) despite her flexible hours, Ragland continued to arrive late for work; 2) D'Andrea had received several complaints about Ragland's phone skills and manners; and 3) D'Andrea needed someone who could do "more" in the position. *Id.* Defendants claim that D'Andrea also gave as a reason for termination co-worker resentment over Ragland's flex schedule, but Ragland denies hearing this. Pl.'s Facts ¶ 17(1). As for the remaining justifications, they were news to Ragland. She testified that none of these concerns had previously been brought to her attention. *Id.* ¶¶ 14, 17. Furthermore, they were simply false. *Id.* ¶ 17. According to Ragland, D'Andrea offered two additional grounds for termination: Ragland's lack of seniority and her inability to "fit in." Pl.'s Add'l Facts ¶ 37. D'Andrea denies resting Ragland's discharge on either seniority (she points out that retaining her original date of hire rendered Ragland the most senior employee in the department) or failing to fit in.

What the parties do not dispute is that no one at Rock–Tenn, including D'Andrea, indicated that age was a factor in Ragland's dismissal or ever commented overtly on Ragland's age. Pl.'s Facts ¶ 18. Ragland therefore offers some alternative theories to support her claim of age discrimination. She first points to the fact that she was replaced by someone much younger—a woman named Donna Ball, who had served as an attendant in D'Andrea's wedding. Pl.'s Add'l Facts ¶¶ 46, 73. *Id.* ¶ 73. But Ball also had worked with D'Andrea for three years before D'Andrea departed for Rock–Tenn, so D'Andrea was familiar with Ball's abilities, which

included experience in customer service. Defs.' Facts ¶ 19. The second alleged indication of discrimination is that Maria Maniak, a younger employee, was permitted to arrive after 8:00 a.m. and leave before 5:00 p.m. without repercussion. Pl.'s Facts ¶ 72. Third, following Ragland's termination, Nancy Dahl, the only other customer service representative over forty, told Ragland that she had been asked to resign. Id. ¶ 47. But Dahl never resigned; rather, she was promoted to Personnel Coordinator in early 1995. Defs.' Resp. Add'l Facts ¶ 47. Finally, Ragland interprets D'Andrea's statement about "fitting in" to mean that she was fired for being older than her co-workers. Pl's Add'l Facts ¶ 64. When considered with the facts that Ragland had never been reprimanded for poor performance or tardiness, verbally or in writing, the only plausible explanation for her discharge, she claims, is age.

## SUMMARY JUDGMENT STANDARDS

Summary judgment is proper when the record shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). A genuine issue for trial exists only when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). When ruling on a motion for summary judgment, the court must view all evidence in a light most favorable to the nonmoving party, and draw all inferences in the nonmovant's favor. Wolf v. Buss America, Inc., 77 F.3d 914, 918 (7th Cir.1996); Taylor v. Canteen Corp., 69 F.3d 773, 779 (7th Cir.1995). However, if the evidence is merely colorable, or is not sufficiently probative, summary judgment may be granted. Liberty Lobby, 477 U.S. at 249–50, 106 S.Ct. at 2511; Unterreiner v. Volkswagen, Inc., 8 F.3d 1206, 1212 (7th Cir.1993).

In ascertaining whether a genuine issue exists, the court must "view the evidence presented through the prism of the substantive evidentiary burden." Liberty Lobby, 477 U.S. at 254, 106 S.Ct. at 2513. If the "record

taken as a whole could not lead a trier of fact to find for the non-moving party, there is no 'genuine' issue for trial." Matsushita Elec. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). In making its determination, the court's sole function is to decide whether sufficient evidence exists to support a verdict in the nonmovant's favor. Credibility determinations, weighing evidence, and drawing reasonable inferences are jury functions, not those of a judge deciding a motion for summary judgment. Liberty Lobby, 477 U.S. at 255, 106 S.Ct. at 2513. In an employment discrimination suit, where credibility and intent are pivotal issues, these standards apply with added rigor. Courtney v. Biosound, Inc., 42 F.3d 414, 418 (7th Cir.1994).

## ANALYSIS

### A. Legal Standards Applicable to Age Discrimination Claims

The ADEA prohibits employers from discriminating against employees between forty and seventy years old on the basis of age. 29 U.S.C. §§ 621(b), 631(a). To prevail on a discriminatory termination claim under the ADEA, the plaintiff ultimately bears the burden of proving, by a preponderance of the evidence, that she would not have been discharged "but for the employer's motive to discriminate against [her] because of [her] age." Denisi v. Dominick's Finer Foods, Inc., 99 F.3d 860, 864 (7th Cir.1996) (citing Weisbrot v. Medical College of Wisconsin, 79 F.3d 677, 680 (7th Cir.1996)). She can meet this burden by presenting either direct or circumstantial evidence of discriminatory intent. Troupe v. May Dep't Stores Co., 20 F.3d 734, 736 (7th Cir.1994). The most common method of proving employment discrimination circumstantially, and the approach taken by Ragland, is the indirect, burden-shifting approach articulated in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802–04, 93 S.Ct. 1817, 1824–25, 36 L.Ed.2d 668 (1973).

To state a prima facie case of discrimination under the McDonnell Douglas method, Ragland must establish that 1) she is within the protected class; 2) she was meeting her employer's legitimate expectations; 3) she

suffered an adverse employment action; and 4) the employer sought a replacement for her. *Mills v. First Fed. Sav. & Loan Ass'n,* 83 F.3d 833, 843 (7th Cir.1996) (citing *Anderson v. Baxter Healthcare Corp.,* 13 F.3d 1120, 1122 (7th Cir.1994)). Once a plaintiff succeeds in making a prima facie showing of discrimination, a rebuttable presumption of discrimination arises and the burden of production shifts to the employer to articulate a legitimate, nondiscriminatory justification for its action. *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 254, 101 S.Ct. 1089, 1094, 67 L.Ed.2d 207 (1981). If the defendant meets its burden of production, the presumption of discrimination dissolves and the burden shifts back to the plaintiff to show, by a preponderance of the evidence, that the proffered reason is a pretext for discrimination. *Wolf,* 77 F.3d at 919 (citing *Sarsha v. Sears, Roebuck & Co.,* 3 F.3d 1035, 1039 (7th Cir.1993)).

Pretext does not mean mistake or bad judgment; rather, it refers to "a lie, specifically a phony reason for some action." Id. (quoting *Russell v. Acme–Evans Co.,* 51 F.3d 64, 68 (7th Cir.1995)) (internal quotations omitted). Pretext may be established by showing either that, more likely than not, discriminatory intent motivated the employer's decision, or that the employer's proffered explanation is unworthy of credence. *Burdine,* 450 U.S. at 253, 101 S.Ct. at 1095; *Sarsha,* 3 F.3d at 1039. In practical terms, the plaintiff must raise a genuine question as to the credibility of the employer's stated reasons, or "specifically refute the facts which allegedly support the employer's claim." *Surti v. G.D. Searle & Co.,* 935 F.Supp. 980, 985 (N.D.Ill.1996) (quoting *Sirvidas v. Commonwealth Edison Co.,* 60 F.3d 375, 377 (7th Cir.1995)). At all times, the plaintiff retains the ultimate burden of persuasion that she was the intentional victim of discrimination. *Burdine,* 450 U.S. at 256, 101 S.Ct. at 1095.

Based on these standards, defendants present alternative grounds for granting summary judgment on Ragland's ADEA claim. First, they claim that Ragland cannot satisfy the second element of her prima facie case, that is, that she was meeting Rock–

Tenn's legitimate expectations. Alternatively, they contend that, even if Ragland has satisfied all four elements of the prima facie case, she has not produced evidence from which a reasonable fact-finder could infer that Rock–Tenn's reasons for terminating her were a pretext for age discrimination. Because the Court agrees with this second contention, we grant summary judgment on Ragland's ADEA claim, Count I. In addition, we decline to exert supplemental jurisdiction over Counts II and III, Ragland's two state-law claims. Those claims are dismissed without prejudice to Ragland's ability to replead them in state court.

### B. *Pretext*

The parties contest whether Ragland has established a prima facie showing of discrimination. But because we find that defendants have met their burden of articulating legitimate reasons for their decision to ·terminate Ragland, we proceed directly to examine whether Ragland has adduced sufficient evidence to raise a triable issue as to pretext. *See Fuka v. Thomson Consumer Electronics,* 82 F.3d 1397, 1404 (7th Cir.1996) (performance deficiencies may simultaneously defeat prima facie case and represent employer's unrebutted justification; "[l]ogically, of course, the prima facie case comes first, but we shall eschew a mechanistic application of *McDonnell Douglas* in this circumstance and proceed to consider whether [plaintiff] met her burden of showing pretext."); *EEOC v. Our Lady of the Resurrection Medical Ctr.,* 77 F.3d 145, 149–50 (7th Cir.1996) ("[T]his court may advance to an ultimate issue in a summary judgment analysis and consider the discrimination question notwithstanding a dispute over a fact necessary for a prima facie case."); *Washington v. State of Illinois DCFS,* 919 F.Supp. 1182, 1188–89 (N.D.Ill. 1996) (advancing directly to pretext even though parties disputed element of prima facie case). This approach of dispensing with an analysis of the prima facie case follows from the well-recognized principle that "[w]here the defendant has done everything that would be required of him if the plaintiff had properly· made out a prima facie case, whether the plaintiff really did so is no longer relevant." *United States Postal Serv. Bd. of Governors v. Aikens,* 460 U.S. 711, 103

S.Ct. 1478, 75 L.Ed.2d 403 (1983); *see also Jayasinghe v. Bethlehem Steel Corp.,* 760 F.2d 132, 135 (7th Cir.1985) (citing *Aikens* for the proposition that "the prima facie threshold is no longer a relevant issue once the defendant has come forward with evidence of legitimate reasons for its actions that would rebut a prima facie showing of discrimination").

■ In support of their decision to terminate Ragland, defendants offer three reasons, which mirror those that D'Andrea relayed to Ragland on the day she was fired. First, defendants assert that Ragland was consistently tardy, and required a schedule that was not in keeping with the established office hours for customer service representatives and that prompted complaints from co-workers. Second, they maintain that Ragland was not performing well; she could not fulfill all of the accounts receivable and customer service duties that she was hired to perform. Third, they point to the fact that D'Andrea had received myriad complaints from management, salespersons, customers and Ragland's co-workers about her refusal to answer the phones, as well as her poor manners and performance when she did take calls. To meet their burden of production, defendants need only set forth evidence "which, taken as true, would permit the conclusion that there was a nondiscriminatory reason for the adverse action." *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 509, 113 S.Ct. 2742, 2748, 125 L.Ed.2d 407 (1993) (emphasis omitted); *see also Timm v. Mead Corp.,* 32 F.3d 273, 275 (7th Cir.1994) ("[F]or a reason to be 'legitimate,' in the sense of sufficient to rebut a prima facie case, it need not be a good or sympathetic justification for what the employer did; it need only be nondiscriminatory and . . . explain why the challenged action was taken." ). The above reasons, facially neutral as they are, easily discharge the defendants' evidentiary burden under *McDonnell Douglas.*

Consequently, the presumption of discrimination has fallen away, leaving Ragland to expose these reasons as a pretext for discrimination. Because Ragland has not introduced any direct evidence of pretext, she must demonstrate that the reasons defendants provided for terminating her lack credibility. *Wolf,* 77 F.3d at 919. It is not enough to show that Rock–Tenn exercised bad business judgment in firing her; rather, she must demonstrate that Rock–Tenn did not honestly believe in the reasons it gave for her discharge. *Id.* To call into question defendants' beliefs, Ragland must refute their specific explanations with a "detailed refutation of events which underlie the employer's negative performance assessment." *Timm,* 32 F.3d at 276 (quoting *Dey v. Colt Constr. & Devel. Co.,* 28 F.3d 1446, 1460 (7th Cir.1994)). "[I]t does not help for [the plaintiff] to repeat the proof that [her] job performance was generally satisfactory. . . . The Company advanced specific reasons for [her] discharge, and [her] rebuttal evidence should be focused on them." *La Montagne v. American Convenience Prods. Inc.,* 750 F.2d 1405, 1409 (7th Cir.1984).

The upshot of all this is that Ragland must create a genuine issue of material fact challenging the integrity of each reason that defendants presented in support of her dismissal. *Wolf,* 77 F.3d at 920; *Russell,* 51 F.3d at 69. She may survive summary judgment by raising a fact issue as to just one reason only if "the multiple grounds offered by the defendant for the adverse action of which the plaintiff complains are so intertwined, or the pretextual character of one of them so fishy and suspicious, that the plaintiff could withstand summary judgment." *Russell,* 51 F.3d at 70. After much thought, we determine that Ragland fails to impugn defendants' honest belief in at least two of their proffered reasons: her deficient phone skills and inability to perform the tasks for which she was hired. Defendants' third justification, which we consider to comprise two separate issues—Ragland's flex schedule and tardiness—is not so "intertwined" with the performance-related grounds, nor so "fishy" by itself, to cast doubt on the motivation for her termination. Finally, we determine that none of Ragland's additional attempts to show pretext have merit. Accordingly, Ragland has failed to raise a genuine fact question on the issue of pretext.

### C. *Ragland Has Not Refuted Defendants' Two Performance–Related Concerns*

#### 1. *Complaints About Ragland's Phone Demeanor Stand Unrebutted*

One of the grounds on which defendants base Ragland's termination is her poor performance with respect to customer calls. The parties dispute whether Ragland was told up front that, as a customer service representative, she would have to answer the phones, but there is no question that Ragland did, eventually, begin taking calls. Defendants present specific evidence that the results were less than satisfactory. Terrence Dane, an account manager at Rock–Tenn, submitted an affidavit testifying that numerous customers complained to him about Ragland's telephone manners. Dick Korff, the office manager, stated in his affidavit that Ragland consistently confused callers' names. On one occasion in particular, Ragland mispronounced the name of a doctor who was caring for Korff's wife in the hospital. Although neither Korff nor Dane talked to Ragland about these issues, they relayed their concerns to D'Andrea.

Ragland rejoins by generally denying that her telephone skills were deficient. She admits to mispronouncing the name of the doctor treating Korff's wife, but attempts to downplay the significance of this event by charging that the name was so difficult that Korff himself could not have pronounced it correctly. Her response to Dane's allegations of customer complaints is limited to the assertion that, in the one month her employment overlapped Dane's, he could not have acquired enough customers to complain about her. Furthermore, she claims that any complaints about her competence in taking calls should have been brought to her attention; because they were not, she concludes, no one must have complained.

We find that Ragland's assertions sorely lack the detail and probativeness necessary to call into question the defendants' beliefs about her phone skills. First, she has presented no evidence to refute the factual bases for defendants' negative performance assessment. Second, she offers nothing more than her own, self-serving testimony that her performance was generally satisfactory, which,

as a matter of law, is insufficient to show pretext. Finally, she admits to at least one instance of less-than optimal performance, bolstering the defendants' belief that she had trouble taking calls correctly.

We first observe that the facts underlying Rock–Tenn's negative assessment of Ragland's phone skills remain intact. For instance, Ragland has presented no proof refuting the fact that Dane's customers called in to complain about her. *See Gadsby v. Norwalk Furniture Corp.*, 71 F.3d 1324, 1337–38 (7th Cir.1995) (Flaum, J., concurring) (to show pretext, plaintiff must specifically rebut factual basis for testimony that customers complained about him). She simply asserts that Dane could not possibly have built, in one month, a broad enough base of customers who could have complained. But absent any evidence documenting that Dane had only a few customers during Ragland's tenure, and without knowing whether Dane came to Rock–Tenn with an established customer base, we have no basis for questioning Dane's belief in his testimony. Ragland's case suffers from the absence of positive customer, supervisor, or co-worker appraisals of her phone proficiency. *See Dale v. Chicago Tribune Co.*, 797 F.2d 458, 464 (7th Cir. 1986) (finding no evidence of pretext without positive evaluations from personnel file or independent third-party testimonials of adequate performance). Her allegations that a senior salesman orally rated her overall performance as "great," and that a representative of a customer with whom she had frequent contact said she was doing a "good job" lack the specificity needed to challenge the genuineness of Rock–Tenn's belief that Ragland's phone skills were wanting. *See Dey*, 28 F.3d at 1460 ("Our cases ... give little weight to statements by supervisors or co-workers that generally corroborate a plaintiff's own perception of satisfactory job performance."). This Court cannot rely on Ragland's mere word to support these generalized comments, which, even if made, cannot cast doubt on Rock–Tenn's belief that a particular deficiency warranted termination. *Id.*

■ Ultimately, Ragland is left with her own self-serving testimony professing adept-

ness at answering the phones, save a concession that she mispronounced a caller's name on one occasion. She relies exclusively on her own affidavit and deposition testimony, pointing to nothing other than her self-perception that she was performing adequately in this area. But the Seventh Circuit has reiterated repeatedly that the way in which a plaintiff perceives herself is irrelevant; rather, it is the employer's perception that matters. *Karazanos v. Navistar Int'l Transp. Corp.*, 948 F.2d 332, 337 (7th Cir.1991); Dale v. Chicago Tribune Company, 797 F.2d 458–65 (7th Cir.1986); *see Schultz v. General Elec. Capital Corp.*, 37 F.3d 329, 334 (7th Cir.1994) ("[A]n employee's 'own self-serving remarks standing alone are insufficient to raise doubt as to the credence of the employer's explanation for termination.'") (citations omitted); *see Aungst v. Westinghouse Elec. Corp.*, 937 F.2d 1216, 1223 (7th Cir.1991) ("[A] plaintiff's self-serving testimony regarding his own ability is insufficient to contradict an employer's negative assessment of that ability.") (internal quotations and citations omitted). Simply telling the Court that she was performing competently in taking phone calls, without offering specific facts to back up that statement, or to rebut Rock–Tenn's contrary judgment, will not clear the pretext hurdle. *See Dale*, 797 F.2d at 464–65 ("[The plaintiff] must do more than challenge the judgment of his superiors through his own, self-interested assertions.").[2]

■ Moreover, Ragland admits to at least one instance of poor performance (although she does not characterize it as such)—mispronouncing the name of one of Korff's callers. Acknowledging this episode dooms her ability to show that D'Andrea and Rock–Tenn officials manufactured her deficient phone skills. Her attempts to excuse and downplay the situation simply do not impugn the defendants' belief that it was significant enough to justify termination. *See Sample v. Aldi, Inc.*, 61 F.3d 544, 549 (7th Cir.1995) ("Although Sample believes that the incident was insignificant, to survive summary judgment he must call into question the honesty of [his employer's] belief that it was significant."). Regardless of whether this Court would think the episode a sufficient reason for termination, we are not to judge the wisdom of defendants' business decisions, "no matter how medieval the firm's practices, no matter how high-handed its decisional process, no matter how mistaken the firm's managers." *Aungst*, 93/ F.2d at 1220 (internal quotations and citations omitted). Furthermore, Ragland presents no evidence that Rock–Tenn did not place a premium on its customer service representatives' phone manners and efficiency. *See Schultz*, 37 F.3d at 334 (suggesting that plaintiff could meet pretext burden by showing employer based firing on irrelevant performance criterion). Although Ragland claims that she was never informed that answering phones was a job requirement, it is undisputed that all the other customer service employees answered phones, that Ragland had answered phones as a sales service secretary in Rock–Tenn's Hillside office, and that Ragland did eventually start taking customer calls. Even assuming Ragland was unaware at the time of her interview that customer service would entail answering phones, Ragland has not shown that Rock–Tenn did not genuinely expect that, when she actually took a call, her conduct was to be beyond reproach. *See Timm*, 32 F.3d at 275 ("If an employer genuinely expects a competent employee to be better than competent and fires him for not excelling, the employer's conduct is, for purposes of the federal employment discrimination law, adequately explained.").

Ragland's protestations that no one complained to her about phone manners are beside the point. She points to no Rock–Tenn policy requiring progressive discipline or even notice before termination. And Ragland presents no legal authority standing for the proposition that an employer must give an employee notice of performance deficiencies before taking corrective action, absent contractual provisions to the contrary. If anything, the authority in our Circuit indi-

---

**2.** Ragland nevertheless endeavors to show pretext by likening herself to the plaintiff in *Wohl v. Spectrum Mfg., Inc.*, 94 F.3d 353 (7th Cir.1996). However, unlike Wohl, Ragland has produced no affirmative, objective evidence to refute the defendants' honest belief in the reasons for her termination.

cates an unwillingness to impose a notice prerequisite to termination. *Makely v. Marketing Alternatives, Inc.*, 1995 WL 42358 (N.D.Ill.1995); *see also Denisi*, 99 F.3d at 865 ("Mr. Denisi's deposition testimony, in which he claimed that his job performance was adequate and that he was not warned of persistent performance problems, does not constitute affirmative evidence that can defeat a summary judgment motion."); *Rand v. CF Indus., Inc.*, 42 F.3d 1139, 1145 (7th Cir.1994) (employee could not rely on employer's failure to inform him of poor performance before discharge where employer had no policy obligating it to do so.

In short, Ragland has been unable either to show that D'Andrea and Rock–Tenn management lied about the importance of good phone skills, or to refute defendants' belief that her phone performance left something to be desired. In her brief, Ragland makes much of the fact that defendants present no documentary evidence of her failings, and contends that the Court is left with a "swearing contest," to be resolved by a jury. This argument has no merit. Ragland is the party with the burden of demonstrating pretext and, ultimately, of proving discrimination. It is not incumbent on the defendants to establish the truth of their position or prove the absence of discrimination. Credibility does not enter the picture until Ragland presents evidence from which a jury could reasonably infer that Rock–Tenn made up its reasons for firing her. *Denisi*, 99 F.3d at 866 n. 7 ("An 'ADEA case turns upon the credibility of witnesses only when the employee offers specific evidence from which the finder of fact may reasonably infer that the employer's proffered reasons for the adverse job actions did not represent the truth.'") (quoting *Weisbrot v. Medical College of Wisconsin*, 79 F.3d 677, 682 (1996)). Because she has failed to set forth such evidence on this issue, a jury has no competing facts from which to choose.

In this respect, Ragland bears a striking resemblance to the plaintiff in *Rand v. CF Industries, Inc.*, 42 F.3d 1139 (7th Cir.1994). Mr. Rand was hired as CFI's Assistant General Counsel at age 47. Although his first year went smoothly, he soon began experiencing rifts with company executives. Eventually, a number of CFI officers told Rand's supervisor that they were dissatisfied with Rand. They found him difficult to work with, thought he wasted their time, and ultimately quit seeking his counsel. Without giving Rand a chance to remedy these problems, Rand's supervisor fired him. Rand then sued CFI for age discrimination, claiming, *inter alia*, that his fine performance record belied the executives' negative assessments. *Id.* at 1145. He denied that CFI executives had stopped asking him for advice, or that he had offended them in any way. *Id.* The court granted summary judgment based on Rand's inability to show pretext, holding that "Rand cannot avoid summary judgment merely by asserting that CFI's executives are lying." *Id.* at 1146. Instead, Rand had to "produce specific facts that cast doubt upon CFI's stated reasons for its action or raise significant issues of credibility." *Id.* Although Rand offered his own testimony that CFI management was not to be believed, the court held that

Rand simply has not produced evidence from which a jury could reasonably infer that CFI's stated reasons for his discharge are unworthy of credence. His case rests almost exclusively on his uncorroborated assertion that no less than eight CFI executives are lying in an effort to hide CFI's age discrimination. Rand has failed to produce evidence which would render an inference of age discrimination reasonable in light of competing inferences.

*Id.* at 1147.

Likewise, Ragland offers the Court nothing more than her word that she is telling the truth about her performance level, while asking us to assume that D'Andrea, Dane and Korff are lying. Yet, like Rand, she has produced no specific facts that would lead us to question their integrity. The remainder of her arguments are merely "directed toward the wisdom of [her employer's] actions, not the factual basis for [that] decision." *Id.* at 1145. Unable to cast doubt on the honesty of defendants' belief that her phone skills were lacking, Ragland has created no issue of fact for the jury.

### 2. *Defendants' Belief that Ragland Failed the Demands of Her Position Remains Unchallenged*

The second justification defendants offer for Ragland's termination is her inability to fulfill all of the functions that she was hired to perform. To this end, D'Andrea testified that she prodded Ragland to "pick up the pace" in February of 1993. According to D'Andrea, Ragland was able to perform only the invoicing part of her job, burdening D'Andrea with Ragland's remaining accounts receivable and customer service duties. Additionally, in May 1993, D'Andrea talked to Ragland about logging customer invoices in a timely fashion. D'Andrea characterizes the conversation as a reprimand for sluggish performance. Ragland, while conceding that D'Andrea discussed logging procedures with her, insists that D'Andrea's comments were intended to educate, not criticize. Ragland also disputes that D'Andrea asked her to step up her learning curve in February, or, indeed, that she was ever asked to perform the additional functions to which D'Andrea refers. Consequently, Ragland concludes, this basis for termination is a pretext for age discrimination.

Again, Ragland has failed to refute the defendants' explanations with specific facts. First, Ragland admits that D'Andrea spoke with her about logging customer credits; her subjective impressions of that conversation are irrelevant. Second, she presents no evidence that she was, in fact, performing adequately in this area. Instead, she offers her own, legally insufficient allegations of good general performance. Each point is fatally inconsistent with pretext.

We may put aside Ragland's denial that she was required to do more than log invoices because Ragland has not cast doubt on D'Andrea's belief that her performance was deficient even in this capacity. It is undisputed that D'Andrea discussed logging procedures with Ragland in May 1993. That Ragland and D'Andrea differ on the tone that this conversation assumed does not create an issue of fact as to how D'Andrea viewed Ragland's abilities. " '[The employee's] perception of himself ... is not relevant. It is the perception of the decision maker which is relevant.' " *Karazanos,* 948 F.2d at 337–38 (quoting *Weihaupt v. American Medical Ass'n,* 874 F.2d 419, 428 (7th Cir.1989)); *Dale,* 797 F.2d at 464–65 (same). D'Andrea's perception need not have been accurate or fair; the issue is whether it was genuinely maintained. *Makely,* 1995 WL 42358, at *7 (N.D.Ill. Feb.2, 1995). Ragland's burden, then, is to adduce specific evidence that D'Andrea did not in good faith believe Ragland's logging performance was inadequate. Simply portraying their discussion about logging procedures in a favorable light does not satisfy this burden.

More importantly, Ragland has produced no evidence that she was performing the logging function in an acceptable manner. When faced with allegations of deficient performance in some capacity, a plaintiff must demonstrate adequate performance in that particular area. *Anderson v. Stauffer Chem. Co.,* 965 F.2d 397, 403 n. 2 (7th Cir.1992); *see Mills,* 83 F.3d at 846 (affirming summary judgment where plaintiff "brought forth no evidence that she was performing satisfactorily in the very area that gave [the employer] the most concern."). Nowhere does the record indicate that Ragland's performance in logging customer invoices was satisfactory. Ragland seeks to rely on her own testimony that several co-workers indicated she was doing a "good job." However, even if we credit these alleged statements, they lack the requisite tie to her invoicing work. Ragland's remaining evidence on this point is limited to assertions in her affidavit that she performed both customer service and invoicing functions "from the beginning," Pl.'s Add'l Facts ¶ 12, and that she worked "in a professional manner up to the legitimate expectations of Rock–Tenn," Ragland Aff. ¶ 6. These self-serving testimonials touting good general performance are as ineffective in this context as they were in rebutting defendants' estimation of her phone skills. *Schultz,* 37 F.3d at 334; *Aungst,* 937 F.2d at 1223.

Consequently, Ragland has not succeeded in contradicting the defendants' belief that she was not competently performing all the tasks she had been hired to do. Because her assertions to the contrary are unsupported by specific facts, she has raised no genuine

issue for a jury to decide. We fully recognize that obtaining evidence shedding light on genuineness of the employer's beliefs is sometimes elusive. Nevertheless, the law requires plaintiffs to produce some evidence, besides their own conclusory testimony, indicating that the employer is lying about its reasons for termination. This Ragland has failed to do.

### 3. While Defendants' Final Justifications Present Issues of Fact, They Do Not Cast Doubt on the Others

■ Defendants advance a third reason for Ragland's termination, which is actually comprised of two separate justifications—habitual tardiness and her ten-to-seven flex schedule. Technically, it does not matter whether defendants honestly believe that either scheduling or tardiness supports Ragland's discharge unless we find these issues "so intertwined [with the other grounds], or the pretextual character [of them] so fishy and suspicious," that they cast doubt on the credibility of the other proffered justifications. *Wolf*, 77 F.3d at 920 (quoting *Russell v. Acme–Evans Co.*, 51 F.3d 64, 69 (7th Cir. 1995)) (internal quotations omitted). Subject to this exception, age discrimination plaintiffs can withstand summary judgment only if they raise an issue of fact as to the credibility of every reason the defendant presents in support of dismissal. *Id.* As long as one reason remains unquestioned, summary judgment is in order. *Id.*

Initially, we note that tardiness and scheduling are, in reality, two separate issues. And each presents a question of fact as to pretext. Defendants cannot rely on Ragland's flex schedule as a reason for termination because they approved it. We also find that, construing the evidence in the light most favorable to Ragland and drawing all inferences in her favor, there is a question of fact as to defendants' honest belief that Ragland was habitually tardy.

Nevertheless, we cannot say that either justification infects the credibility of the others. Tardiness and scheduling are issues easily separated from job performance. An employee who comes in on time every day, during business hours, may still be performing poorly. Assuming *arguendo* that Rag-

land kept a prompt, eight to five schedule, this does not affect Rock–Tenn's unrebutted claims that Ragland's telephone skills were deficient and that she was not adept at invoicing. We thus find that the tardiness and scheduling justifications are not sufficiently intertwined with Rock–Tenn's performance-based reasons to corrupt their veracity. Because Ragland has refuted, at most, the genuineness of only two of four reasons proffered by defendants, she cannot defeat summary judgment.

### D. Ragland's Remaining Efforts to Show Pretext Fall Short

Finally, we address Ragland's attempts to 1) demonstrate pretext by showing that Rock–Tenn's younger employees were treated better than its older employees, and 2) show age bias through a remark, made by D'Andrea, which Ragland interpreted to reflect negatively on her age. Neither attempt succeeds.

■ First, Ragland belabors that fact that Maria Maniak, a younger Rock–Tenn employee, was permitted to arrive after eight and leave before five without suffering adverse consequences. As a matter of law, this claim fails to create an inference of age discrimination. To raise the specter of discrimination with such "comparative evidence," Ragland must show that Rock–Tenn affords "systematically more favorable treatment [to] similarly situated employees not sharing the protected characteristic," in this case, age. *EEOC v. Our Lady of the Resurrection Med. Ctr.*, 77 F.3d 145, 151 (7th Cir.1996). Although Maniak is not in the protected class, Maniak and Ragland are not otherwise similarly situated. It is undisputed that Maniak exhibited none of the performance-related problems that plagued Ragland. *See Lowe v. J.B. Hunt Transport, Inc.*, 963 F.2d 173, 175 (8th Cir.1992) (fellow employee who escaped discipline but did not suffer from same failings as plaintiff was not similarly situated under the ADEA). Moreover, Ragland has produced no evidence that Rock–Tenn systematically treats younger workers more favorably than older employees. As a result, Ragland may not rely on Maniak to prove age discrimination.

■ Next, Ragland seizes on the fact that she was replaced by the much younger Donna Ball, who had served as one of D'Andrea's bridesmaids. Replacement with a younger person, however, is just one of four components to a prima facie case. Standing alone, it is insufficient to show age discrimination. *See Aungst*, 937 F.2d at 1221 (plaintiff must do more that restate prima facie case to sustain burden of establishing pretext). That Ball was D'Andrea's wedding attendant does not alter the equation. The discrimination laws do not ensure that decisionmaking is fair, only that it is free from age bias. *Washington*, 919 F.Supp. at 1189–90. Even Ragland's cries of unfairness are undermined by D'Andrea and Ball's undisputed three-year work history, as well as D'Andrea's unchallenged assessment that Ball was qualified for the position.

Ragland also alleges that her claim of age discrimination is corroborated by Rock–Tenn's efforts to rid itself of another employee in the protected class. Following her termination, Ragland claims that Rock–Tenn requested the resignation of its only other forty-plus Franklin Park employee, Nancy Dahl. Rock–Tenn's alleged attempt to force Dahl out is belied, however, by the undisputed fact that Dahl never resigned. Indeed, she was promoted to Personnel Coordinator in 1995. Moreover, Dahl specifically denies being asked to leave the company. Even had Dahl admitted the request to resign, a co-workers' unsubstantiated age discrimination claim cannot serve as evidence of pretext. *Mills v. First Fed. Sav. & Loan Ass'n*, 83 F.3d 833, 845–46 (7th Cir.1996).

■ Finally, Ragland gleans age-based animus from a remark that D'Andrea allegedly made on the day of her termination. According to Ragland, D'Andrea told Ragland her discharge was based, in part, on an inability to "fit in." Because Ragland interpreted this as a comment on her age, she concludes that we must also construe it in this fashion. However, a similar argument was rejected in *Mills v. First Fed. Sav. & Loan Ass'n.* The plaintiff in Mills testified that one of the company's directors told her that management had a concern about her ability to keep up with banking regulations. 83 F.3d at 841.

She perceived this to be an age-related comment. *Id.* The court, however, found that the comment was not only objectively age-neutral, it did not "permit even an inference that First Federal's proffered reasons for terminating Mills are phony or unworthy of belief." *Id.* at 845. Regardless of whether Mills believed the remarks revealed age bias, this subjective belief did not raise a genuine issue of fact as to pretext. *Id.* at 841. We find it equally difficult to read age into a comment about "fitting in." The remark is objectively neutral and unaccompanied by any other evidence of age bias. And under Mills, Ragland's contrary perception does not raise a jury question.

To summarize, Ragland's attempts to show pretext based on differences in treatment between younger and older employees uniformly fail. In addition, Ragland has introduced no statements made by defendants that permit an inference of age-related bias.

### E. *A Strong Inference of Nondiscrimination Exists*

■ Ragland has presented no evidence that would permit a reasonable trier of fact to infer that her termination was the product of age discrimination. This failure of proof is compounded by the fact that she was hired and fired by the same person within a short period of time. "[I]n cases where the hirer and firer are the same individual and the termination of employment occurs within a relatively short time span following the hiring, a strong inference exists that discrimination was not a determining factor for the adverse action taken by the employer." *Proud v. Stone*, 945 F.2d 796, 797 (4th Cir. 1991). The Seventh Circuit has adopted this logic. *See Rand*, 42 F.3d at 1147 (strong inference of nondiscrimination where same person hired plaintiff at age 47 and fired him two years later at age 49); *Our Lady of the Resurrection Med. Ctr.*, 77 F.3d at 152 (strong inference of nondiscrimination where plaintiff hired and fired in the span of ten months by the same individual). This same hirer/firer inference has "strong presumptive value." *Our Lady of the Resurrection Med. Ctr.*, 77 F.3d at 152. The rationale is that it is suspect to claim that the same manager

who hired a person in the protected age group would have "suddenly developed an aversion to older people." *Lowe*, 963 F.2d at 174–75.

Ragland's case fits this pattern. She was hired, by D'Andrea, for the customer service position in Franklin Park at age 53; D'Andrea fired her eight months later. Although she had retained her original 1988 date of hire by Rock–Tenn's Hillside office, Ragland was nonetheless required to participate in the interview process for the job in Franklin Park, and D'Andrea was under no obligation to hire her. These facts create a strong inference of nondiscrimination, and we find it implausible, given the weakness of Ragland's case, that in eight months D'Andrea had become averse to working with older people. *See id.*

In sum, Ragland cannot avoid summary judgment on her ADEA claim because she has failed to demonstrate that Rock–Tenn's reasons for termination were pretextual. Most significantly, she has not refuted, with specific evidence, the particular facts underlying the defendants' decision to fire her. Nor has Ragland presented any evidence that could be construed to carry age-based animus: D'Andrea's alleged comment about "fitting in" is innocuous, and Ragland has not shown that Rock–Tenn treats its younger employees more favorably than its older workers. Consequently, Ragland has raised no inference to compete with the strong inference of nondiscrimination created by the same hirer/firer facts. There is nothing for a jury to resolve. Summary judgment on Ragland's ADEA claim is therefore granted.

### F. *State Law Claims*

By granting summary judgment on the ADEA claim, we have dismissed the only count supporting federal jurisdiction. Using our discretion under 28 U.S.C. § 1367(c), we decline to exercise supplemental jurisdiction over Ragland's remaining state law claims for breach of contract and defamation. We find that considerations of judicial economy, convenience, fairness, and comity point toward permitting their resolution in state court. *See Timm*, 32 F.3d at 276–77 (outlining court's considerations in determining whether to exercise supplemental jurisdic-

tion). We have issued only one opinion in this case, and, in light of what appears to be minimal discovery by the parties, we believe that concerns of comity and fairness outweigh the relatively limited resources that the Court and the parties have expended. Accordingly, we dismiss Ragland's state law claims without prejudice to her refiling them in state court. In the interim, the Court encourages the parties seriously to consider settlement possibilities.

### CONCLUSION

For the reasons expressed above, defendants' motion for summary judgment is granted as to Count I. Counts II and III, which comprise Ragland's state law claims, are hereby dismissed without prejudice to refiling them in state court.